MILDRED LITZ, PERSONAL REPRESENTATIVE OF THE
ESTATE OF JENNIE V. MURRAY *v.*
HUTZLER BROTHERS CO.

[No. 235, September Term, 1973.]

*Decided February 13, 1974.*

116

The cause was argued before MOYLAN, MENCHINE and DAVIDSON, JJ.

*Delverne A. Dressel* for appellant.

*James D. Peacock* and *Charles P. Goodell, Jr.,* for appellee.

MENCHINE, J., delivered the opinion of the Court.

On September 3, 1970 Jennie V. Murray, then aged 85 years, in the company of her niece, Mildred Litz, visited downtown Baltimore. In due course they went to Hutzler's Downtown Department Store.

Hutzler's downtown store consists of what once was two separate buildings on opposite sides of Clay Street (between Howard and Eutaw Streets). Eventually they were connected in such a way as to straddle Clay Street, a public highway of the City of Baltimore, at the basement and ground floor levels. All other levels of the buildings up to the top level of the shorter became in effect a single entity up to the seventh floor. In other words, the space above the second story, under a franchise from the City, was used for building purposes, causing Clay Street to become a covered public way under Hutzler's store in its east-west course.

Miss Murray, able to walk without cane or assistance, at first had gone to the north building restaurant. After luncheon Miss Murray and her niece descended to the first floor, intending to go to the watch repair counter in the south building. They left the north building through a doorway entering upon Clay Street and crossed that street. This brought them to the Clay Street entrance to the south building. Access through that entrance was provided by way of a revolving door. Miss Litz saw no one in Clay Street in the vicinity of the doorway as she entered the south building. Both women had used the doorway many times before. Miss Litz entered the revolving door first.

She thus described her entry:

> "I always preceded my aunt to slow down the motion of the door, just in case anyone should hit it or make it go a little faster, then I would emerge from the door in turn, and greet her as she came out of her compartment."

Miss Murray entered the revolving door behind her niece. The latter thus detailed what then occurred:

> "As I came out of the door and stood there and turned toward my aunt, who was coming, these two boys approached the door in the alley, and spun it, they hit it with great force, and she literally, she came from her compartment, flew in front of me, and landed approximately * * * 6 to 8 feet [away]."

The two boys followed behind Miss Murray and bent over her where she had fallen. They ran when Miss Litz screamed and their identity was never determined. The deposition of Miss Murray threw little or no further light on the incident. There seemed to be some loss of recollection in that at one point in her testimony she said she was thrown to the street outside the store and thereafter was taken into Hutzler's following the fall. She later indicated otherwise, and all other witnesses agreed that her course through the door was from street to store. She said that the "only thing that caused me to fall was pushing me out that door." Miss Murray sustained severe personal injuries.

Maryland and Massachusetts cases have distinguished claims for injuries brought about by sudden increases of the speed of revolving doors when caused by the acts of third person users on the one hand; from claims for injuries sustained as the result of a defective condition in the revolving door on the other; with liability denied in the first and sustained in the second circumstance. Compare: [Massachusetts] *Norton v. Chandler*, 108 N. E. 897 and *Sterns v. Highland Hotel Co.*, 29 N.E.2d 721; with [Maryland] *Eyerly v. Baker*, 168 Md. 599, 178 A. 691 and *Hamill v. Union Trust Co.*, 241 Md. 219, 216 A. 2d 286.

In the subject case it is conceded that the store premises generally and the revolving door in particular were wholly without physical defects.

In *Hamill, supra*, the facts were thus stated at page 220 [286]:

> "As a frequent visitor to the bank, she had been in and out of the entrance where the accident occurred

on many occasions without ever having experienced any difficulty with the revolving door or the steps at the entrance. Although she was arthritic, she never used a cane or crutch prior to the accident. * * *

On the day of the accident, as the plaintiff was slowly walking through the revolving door to leave the bank, a young man, unknown to her and never thereafter identified, rushed into the bank and rotated the door so rapidly that one of the wings struck her in the back and caused her to fall out of the door and down the steps at the entrance onto the sidewalk. She sustained a fractured hip."

On those facts the Court in *Hamill* said (p. 221 [287]):

"* * * there was no evidence of a causal connection between its [defendant's] alleged negligence and the injury sustained by the plaintiff."

Accordingly, the subject case is controlled by the decision in *Hamill, supra,* unless beyond its purview, by reason of facts and circumstances such as will bring it within the ambit of *Eyerly, supra.*

In *Eyerly* it was said at page 607 [694]:

"So where a storekeeper invites the public to come upon his premises to buy his wares, he is held to a positive affirmative duty to protect them, not only against dangers which may arise from some defect or unsafe condition of the physical property upon which they are invited to enter, but *against dangers which may be caused by the negligent acts of his employees, or even of customers, where, as a reasonably prudent person, he should have anticipated the possible occurrence and the probable results of such acts.*" [Italics supplied.]

The trial court granted the defendant's motion for a directed verdict at the end of the plaintiff's case upon the ground that there was no evidence legally sufficient to establish the negligence of the defendant. From the

judgment in favor of the defendant thereafter entered, the plaintiff has appealed. It is conceded that the plaintiff was not contributorily negligent.

The appellant urges that the rule declared in *Restatement (Second) of Torts* § *344* (1965) applies:

"§ 344.  Business Premises Open to Public: Acts of Third Persons or Animals

A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
   (a) discover that such acts are being done or are likely to be done, or
   (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it."

Appellant urges that the evidence establishes that such prior incidents had occurred as would give notice to the appellee that actions such as caused harm to the appellant had been and were likely to be done but that the appellee had breached its duty to its invitees (a) by failure to warn them of the potential danger and/or (b) by failure to provide adequate guards to protect them against it.

In *Buchanan v. Galliher*, 11 Md. App. 83, 87, 272 A. 2d 814, 817, we said:

"When a trial court is called upon by a motion for a directed verdict to rule upon the legal sufficiency of the evidence to require submission of any issue to a jury, the court must assume the truth of all credible evidence on that issue and of all inferences fairly deducible therefrom, and consider them in the light most favorable to the party against whom the motion is made, and if such evidence and

inferences lead to conclusions from which reasonable minds could not differ, then the issue is one of law for the court and not one of fact for the jury."

We shall consider the evidence in this case in the light of that rule of law.

Four guards, whose duty primarily was related to the prevention of shoplifting, provided the only internal security within the store. No guard patrolled Clay Street. Evidence concerning five prior incidents involving revolving doors was introduced. Some related to the revolving door in the north building; some to that in the south. The incidents were described as follows:

On December 13, 1968 a patron was injured while leaving the door of the north building "when someone pushed the door around very hard and knocked her to the ground. She said it was either a man or a boy."

On November 2, 1969 while a patron was "going through door someone from behind hurriedly swung door and struck her between shoulders. She did not see who it was, only that it was someone (female) in a hurry."

On December 2, 1969 a patron moving from Clay Street through the revolving door was injured when "someone pushed through the door and Mrs. Green fell into the vestibule."

On January 26, 1970 a patron was hurt using the revolving door exit to Clay Street from the leather goods department. "She states she was thrown out into the alley and thought she felt a hand at her back and a sensation of being pushed."

On August 11, 1970 a patron moving to Clay Street from the stationery department "was entering revolving door when a young man spun the door, causing her to fall."

Objection to the plaintiff's offer of evidence as to three other incidents was sustained. Plaintiff thereupon proffered that:

On June 23, 1969 a patron "was extremely upset because four young boys rushed into her as she was crossing Howard

Street, then followed into Clay Street, pushing her through the revolving door and trying to grab her handbag."

On July 28, 1969 a customer claimed "a boy tried to get her pocketbook as she was walking in Clay Street. She would not let go of her pocketbook, and he hit her with his fists."

On March 21, 1970 a patron was "crossing Clay Street to enter Howard Street. She was attacked by six to eight colored girls who tried to grab her purse. When she refused to let go they knocked her to the ground and kicked her in the head."

The proffer was properly rejected. The three incidents were in no way material or relevant to any duty owed by the appellee to its invitees. *Jenkins v. Great A & P Co.*, 128 F. Supp. 169.

A storeowner's duty to guard his invitees from the actions of third persons manifestly will not exceed, either in kind or degree, his general duty to such invitees.

In *Lloyd v. Bowles*, 260 Md. 568, 572, 273 A. 2d 193, 196, it was plain that there is no breach of such duty unless it appears:

> "(1) that the storeowner had actual or constructive notice of a condition which created an unreasonable risk of harm to the invitee, (2) that the storeowner should have anticipated that the invitee would not discover the condition or realize the danger, or would fail to protect herself from the danger, and (3) that the storeowner failed to take reasonable means to make the premises safe or to give adequate warning of the condition to the invitee."

We have found but one Maryland case wherein it had been suggested that failure to provide guards would constitute actionable negligence. The contention was rejected. In *Nigido v. First National Bank*, 264 Md. 702, 288 A. 2d 127, the Court of Appeals found that the bank owed no duty to provide guards as a protection to its invitees against robbers, saying at page 704 [128]:

> "We think he [plaintiff] was an invitee to whom

was owed the same duty a shopkeeper owes his customer, i.e. to use reasonable care for his protection. * * * We see in the declaration not an allegation that the bank's premises, per se, were unsafe for the purpose for which they were being used, but rather that the bank was negligent in failing to have its premises 'properly guarded' against 'foreseeable' robberies. The allegation that this robbery was 'foreseeable' is supported only by the further allegation that there is a 'history of bank robberies at the said location.' "

Answering a further contention that negligence was shown because cameras were not functioning, the Court added at page 705 [128]:

"* * * even if the cameras had been running full tilt it is not likely the robbers would have been deterred even though the pictures taken might have led to their apprehension."

We hold that the incidents admitted in evidence do not, singly or collectively, provide a base for application of the rule declared in *Eyerly* or the *Restatement, supra.* They do no more than demonstrate that use of a revolving door necessarily involves some risk of harm to its user. That risk is not, however, an unreasonable risk such as gives rise to a duty to warn of danger incident to it. The inherent risk was as well known to its user as to the storeowner.

The incidents reflected in appellant's proffer took place on a public street — not the premises of the appellee. The appellee had no duty to patrol the public way. That is the proper subject for police action. *Jenkins, supra*, p. 173.

*Sterns, supra*, very clearly states the rule of law generally applicable in the use of revolving doors, saying at p. 724:

"It is clear that the conditions at the entrance were open and obvious, and only a half hour before the plaintiff's injury she had passed over the step and through the door. It must have been obvious to the plaintiff that the door was adapted for the use

of as many as four persons at the same time on their way in and out of the hotel. * * * Where a condition is obvious to any ordinarily intelligent person, it is the general rule that there is no duty on the part of the defendant to warn of that condition."

The case of *Schubart v. Hotel Astor, Inc.*, 5 N.Y.S.2d 203 (*aff'd*, 8 N.Y.S.2d 567), with equal clarity outlines the circumstances that must be shown to bring into play the rule declared in *Eyerly* and the *Restatement*, saying at p. 206:

"There is no doubt that the owner of an ordinary building, under ordinary circumstances, is not required to have a doorman present or to take any particular action to supervise the use or to control the operation of a revolving door. Here, however, we have neither an ordinary building nor ordinary circumstances. On the contrary they are both, in every sense, extraordinary. The Hotel Astor is a landmark in this city. It is so well known that the court may take judicial notice of the fact that it is one of the most popular hotels in the heart of the most congested part of the most congested metropolis in the world. To it flock people of every kind and of every age; to them it is open at all times. Neither can the court ignore the commonly known fact that on Saturday nights this congestion is invariably increased; and that on the day of a great sporting event, such as the Army-Notre Dame Football Game, the influx of people from the suburbs and other cities further aggravates this congestion.

Under these circumstances and with the hotel as the headquarters of one of the football factions, the court cannot say as matter of law that on that particular Saturday night no duty devolved upon defendant to have a doorman present or to take some other means or precautions to control the operation of the revolving door and to supervise its

use. The number of people who congregated in the lobby and corridor was extraordinary and the majority of them exhibited, in the plain view of those in charge of the hotel, a gay, hilarious and carousing mood. Defendant could not help having notice of the unusual number of people present and of their mood. When an extraordinary number of people, who openly manifest such spirited predilections, which are neither normal nor peaceful for a hotel, take possession of its main lobby or corridor, defendant could readily anticipate that the revolving door would not only be subjected to excessive use but also that it would be likely to receive rough usage and unseemly abuse."

The appellant has directed us to no revolving door case in conflict with the cases cited herein and we have found none. The out of state cases cited by appellant involve factual situations so completely different as to be without persuasion as authorities in this case.

This unfortunate injury was solely the product of a transiently negligent action by two boys, the occurrence of which could not reasonably have been foreseen or prevented by the appellee.

No actionable negligence was shown. The questioned evidence was properly excluded.

*Judgment affirmed.*
*Costs to be paid by appellant.*