SCOTT, ETC. ET AL. *v.* WATSON, ETC. ET AL.

[Misc. No. 5, September Term, 1975.]

*Decided July 13, 1976.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ.

*Alvin Dwight Pettit* and *Michael Bowen Mitchell,* with whom was *E. Thomas W. Stahl* on the brief, for appellants.

*Stanley B. Rohd,* with whom were *George D. Solter* and *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellees.

MURPHY, C. J., delivered the opinion of the Court.

This case has come to us from the United States District Court for the District of Maryland, pursuant to the Uniform Certification of Questions of Law Act, Maryland Code (1974) Courts & Judicial Proceedings Article, § 12-601 *et seq.*; that Act authorizes us to answer questions of state law certified by (among others) a United States District Court "which may be determinative of the cause then pending in the certifying court and as to which it appears . . . there is no controlling precedent in the Court of Appeals of this state."

Plaintiff Evelyn Ann Scott originally brought suit in the Superior Court of Baltimore City against the owners of the Sutton Place Apartments (the defendants), who removed the case to the federal court. She sued both as the surviving child of James Aubrey Scott, Jr. and in her capacity as personal representative of his estate. In her wrongful death and survivor's actions she claimed that the defendants had breached a duty owed to Scott as one of their tenants to protect him from criminal acts of third parties committed in common areas within their control, and that the breach of duty proximately caused Scott's death. In its order of certification, the District Court certified three questions of law, *i.e.*:

> "(1) Does Maryland law impose upon the landlord of an urban apartment complex a duty to tenants to protect them from the criminal acts of

third parties committed in common areas within the landlord's control and, if so, what is the extent of such duty?

"(2) If no such duty exists generally, would such a duty be imposed if the landlord has knowledge of increasing criminal activity on the premises or in the immediate neighborhood?

"(3) Would such a duty be imposed upon a landlord if such landlord has undertaken specific measures to protect his tenants from the criminal acts of third parties? "

The statement of relevant facts, as certified by the District Court, and to which we are limited, is as follows: "Sutton Place Apartments, at 1111 Park Avenue in Baltimore City, was owned and operated by the Department of Housing and Urban Development until January 29, 1973, when it was purchased by Sutton Place Associates, a limited partnership whose general partners are the defendants in this action. Sutton Place is a multistory structure with a number of retail shops on the ground level and 290 apartment units occupying fifteen floors above ground. Common areas for the use of tenants include a lobby, halls, stairways, an underground parking garage, and two outdoor parking lots. Access to the underground parking garage is by means of a sliding steel door activated by an electrocard device.

"On the evening of July 12-13, 1973, between the hours of 11:45 p.m. and 12:10 a.m., the plaintiff's decedent, James Aubrey Scott, Jr., a tenant at Sutton Place, was killed by the blast of a shotgun within several yards of his automobile in the apartment's underground parking garage. At the time of his death, Scott was facing trial in the United States District Court for the District of Maryland under a multi-count indictment charging him with conspiracy to distribute heroin. The police report indicates that there were scattered in the general area of Scott's body numerous sheets of paper with printed slogans stating 'Dope dealers are traitors, dope dealers must die.' Although there was a guard on the

apartment premises at the time of the murder, the guard was unaware of the crime, and Scott's body was in fact discovered by a tenant approximately one and one-half hours after the crime was committed.

"Scott's assailant has never been positively identified, nor has it been determined exactly how the murderer gained entrance to the garage. Some 450 tenants of the apartment, together with guests and invitees of such tenants, had lawful access to the underground parking garage where Scott was shot. One individual was in fact charged with the murder but was acquitted following a trial in the Criminal Court of Baltimore City."

\* \* \*

"When Sutton Place Associates purchased the apartment complex, the following security devices and procedures provided security to tenants and their invitees: (1) Two closed circuit television cameras monitored the basement of the building and the rear of the retail stores on the ground level; (2) A guard supplied by the Loughlin Security Agency, Inc. was on duty nightly from 10:00 p.m. to 6:00 a.m. and patrolled the premises four times each night, except that the outside grounds and garage area were patrolled only twice nightly; (3) A switchboard operator in the lobby monitored the television system and the main entrance to the building; and (4) At the main entrance was stationed a doorman who would park the car of any tenant wishing this done for him.

"In spite of these security precautions, Sutton Place tenants in the period before Scott's murder were apprehensive about the high incidence of crime in the surrounding neighborhood.

"At the time of the meeting of the Sutton Place Tenants Association held on February 20, 1973, three officers of that organization expressed their concern to the new owners, and particularly noted that only one doorman was on duty.

"Records of the Baltimore City Police Department indicate that for the period January 4, 1972 to July 13, 1973, 56 crimes against property and 16 crimes against persons

were reported to have been committed on or near the apartment premises. Defendants learned in late March or early April of 1973 of five or six incidents involving illegal entry into tenants' apartments, but none of the incidents involved personal injury to tenants. In addition, police reports indicate that the following occurred in or around the apartment premises during the three months immediately preceding Scott's death: (1) A car was stolen from either the underground garage or lobby level garage on April 22, 1973; (2) Two persons were assaulted and robbed on a public street near the apartment by a person who had followed the victims out of one of the ground level shops, on April 23, 1973; (3) A tenant's apartment was burglarized between June 9 and June 11, 1973; (4) A vehicle owned by a Sutton Place resident was stolen from a public street near the apartment on June 17, 1973, and several days later the owner was informed by telephone that he could have his car back for a price; (5) A tenant's apartment was burglarized on June 24, 1973; and (6) One of the ground level stores open to the public was robbed and a store employee raped during the afternoon of July 2, 1973. However, before July 13, 1973, defendants had no knowledge that any tenant or invitee had been the victim of a crime involving physical harm or the threat of physical harm occurring in the underground garage or other common areas within the apartment building.

"Shortly after they took over management of Sutton Place, defendants announced to tenants certain steps they planned to take to make the building more secure. Although all of the security measures planned had not been put into effect at the time of Scott's murder, defendants had taken certain additional steps to protect their tenants from crimes committed by third parties."

Plaintiff Scott contends that the duty placed upon hotel owners and common carriers to protect patrons from criminal assaults should be extended to the landlord-tenant relation in light of the "changing relationships" between landlord and tenant in an urban luxury apartment setting. She relies primarily on *Kline v. 1500 Mass. Ave. Apts.*, 439

F. 2d 477 (D.C. Cir. 1970). Absent such a general duty, she contends that Maryland should follow the rule of those jurisdictions which impose a protective duty upon the landlord if he had knowledge of increasing criminal activity on the premises or in the neighborhood, or had undertaken specific protective measures. The defendants, while admitting knowledge of criminal activity on the premises and in the neighborhood, and having increased security measures, argue that no such duty should be imposed upon them since it would result in the imposition of a standard of care incapable of definition and performance, citing *Goldberg v. Housing Auth. of Newark,* 38 N. J. 578, 186 A. 2d 291 (1962).

### (1)

The basic elements necessary for a cause of action in negligence "are a duty or obligation which the defendant is under to protect plaintiff from injury, a failure to discharge that duty, and actual loss or injury to the plaintiff proximately resulting from that failure." *Peroti v. Williams,* 258 Md. 663, 669, 267 A. 2d 114 (1970). We held in *Macke Laundry Serv. Co. v. Weber,* 267 Md. 426, 429-31, 298 A. 2d 27 (1972), that a landlord who has set aside areas for the use of his tenants in common owes them the duty of reasonable and ordinary care to keep the premises safe. In other words, mere ownership of buildings does not render the owner liable for injuries sustained by tenants since the landlord is not an insurer of such persons; rather, as we said in *Elmar Gardens, Inc. v. Odell,* 227 Md. 454, 457, 177 A. 2d 263 (1962), "where a landlord leases separate portions of a property to different tenants and reserves under his control halls, stairways, and other portions of the property used in common by all tenants, he is only obliged to use reasonable diligence and ordinary care to keep the portion retained under his control in reasonably safe condition."

While the Maryland cases recognizing this duty on the part of the landlord have primarily involved injuries resulting from defects in the premises, we think the rule encompasses within its general ambit injuries sustained by

tenants as a result of criminal acts committed by others in the common areas within the landlord's control.

Thus, we hold that there is no special duty imposed upon the landlord to protect his tenants against crimes perpetrated by third parties on the landlord's premises. Indeed, this is the general rule in other jurisdictions. *See, e.g., Ramsay v. Morrissette,* 252 A. 2d 509 (D.C. 1969); *Braitman v. Overlook Terrace Corp.,* 68 N. J. 368, 346 A. 2d 76 (1975); *Goldberg v. Housing Auth. of Newark, supra; Gulf Reston, Inc. v. Rogers,* 207 S.E.2d 841 (Va. 1974). *See generally* Annot., 43 A.L.R.3d 331 (1972). In a somewhat analogous situation we noted, in *Nigido v. First Nat'l Bank,* 264 Md. 702, 288 A. 2d 127 (1972), the absence of authority for the proposition that a bank owed a customer, shot by robbers in the course of a bank holdup, a special duty of protection; we said there that he was owed the same duty a shopkeeper owes his customer, *i.e.,* to use reasonable care for his protection. *See also Eyerly v. Baker,* 168 Md. 599, 607, 178 A. 691 (1935), holding a storekeeper who invites the public to come upon his premises to a "positive affirmative duty to protect them, not only against dangers which may arise from some defect or unsafe condition of the physical property upon which they are invited to enter, but against dangers which may be caused by negligent acts of his employees, or even of customers, where, as a reasonably prudent person, he should have anticipated the possible occurrence and the probable results of such acts"; and *Litz v. Hutzler Brothers Co.,* 20 Md. App. 115, 314 A. 2d 693 (1974), to the effect that a storeowner's duty to guard his invitees from negligent actions of third persons does not exceed in kind or degree his general duty to such invitees.

The general rule is a subsidiary of the broader rule that a private person is under no special duty to protect another from criminal acts by a third person, in the absence of statutes, or of a special relationship. *See* Restatement of Torts (Second) § 315 (1965) (no duty to control third person's conduct so as to prevent physical harm to another unless a special relation exists between actor and third person, or between actor and the other). While such a special

relationship heretofore recognized in Maryland is that of common carrier-passenger, the duty has only been applied where the carrier could have prevented the injury. *See Pennsylvania R.R. Co. v. Cook,* 180 Md. 633, 26 A. 2d 384 (1942); *United Rwys. Co. v. Deane,* 93 Md. 619, 49 A. 923 (1901); *Tall v. Steam Packet Co.,* 90 Md. 248, 44 A. 1007 (1899).

*Kline v. 1500 Massachusetts Avenue Apartment Corp., supra,* upon which Scott relies, placed a special duty on a landlord to take steps to protect tenants from foreseeable criminal acts by third parties. In that case, Kline was criminally assaulted and robbed in the common hallway of the apartment house. From the time she leased her apartment from the landlord, security measures decreased despite notice to the landlord of increasing criminal activity in the common areas. The majority in *Kline* found both a specific duty in tort to protect the tenant from crimes committed by third parties upon the premises, and a contractual obligation, implied in the lease, to continue protective services at the level the landlord was employing at the time Kline became a tenant. Finding a breach of these duties and a foreseeable risk, *Kline* concluded that the landlord's liability was clear.

As indicated, notwithstanding *Kline,* we decline to impose a special duty on a landlord to protect his tenants from criminal activity since to do so would place him perilously close to the position of insurer of his tenants' safety. Our answer to the first certified question is that Maryland law does not impose upon the landlord of an urban apartment complex a special duty to tenants to protect them from the criminal acts of third parties committed in common areas within the landlord's control. The duty of a landlord is to exercise reasonable care for the tenant's safety, and traditional principles of negligence regarding proximate or intervening causation will determine whether the landlord is liable for an injury resulting from a breach of this duty, including an injury caused by criminal acts of third parties.

■■■■■■■■

■■■■■■■■

(2)

Whether a duty is imposed upon the landlord to protect his tenants from criminal acts of third parties where he has knowledge of increasing criminal activity on the premises, or in the immediate neighborhood, is the substance of the second certified question.

In *Sherman v. Concourse Realty Corp.*, 47 A.D.2d 134, 365 N.Y.S.2d 239 (Sup. Ct. 1975), the landlord of a multiple dwelling had actual knowledge of criminal activities within the building. A system of locks and buzzers controlling the doors leading to common hallways had been permitted to fall into a state of disrepair, and the lock on the lobby entrance door was inoperative — facts concerning which the landlord had notice. A tenant was assaulted and robbed in the lobby; there was evidence from which a jury could have concluded that the perpetrator had entered the building through the lobby door. The tenant was held in these circumstances to have established a prima facie cause of action for the landlord's negligence even though the scope of the landlord's duty was only to exercise reasonable care in common areas for the tenant's safety. Similarly, in *Ramsay v. Morrisette, supra*, the tenant alleged in her complaint that the negligence of the landlord permitted an intruder to enter her apartment and assault her. The court reversed a summary judgment entered for the landlord, ruling that the tenant's complaint sufficiently stated a cause of action in that the landlord (1) did not replace the deceased full-time resident manager, (2) failed to prevent intruders and strangers from sleeping in the halls and using the halls as urinals, (3) failed to inform the police of the above situation, and (4) failed to install a lock on the front door. The court said:

> ". . . The traditional duty of reasonable care under all the circumstances . . . [applies] to those parts of the building used in common by all tenants where it can be shown that the landlord was aware of a dangerous situation and took no action either

to remedy the situation or to warn the tenants of the danger. . . .

"We by no means suggest that there is a general legal duty on the landlord to provide full time resident managers or to install locks on the front door of an apartment house. The test is what is reasonable in all the circumstances. And we point out that if in these changing times of modern urban living circumstances exist which may require that the landlord's duty of reasonable care encompass steps to deter or prevent criminal acts against his tenant, these same circumstances affect the tenant's concomitant duty to use reasonable care for his own safety. . . ." 252 A. 2d at 512-13.

The duty of a landlord to exercise reasonable care for the safety of his tenants in common areas under his control is sufficiently flexible to be applied to cases involving criminal activity without making the landlord an insurer of his tenant's safety. If the landlord knows, or should know, of criminal activity against persons or property in the common areas, he then has a duty to take *reasonable* measures, in view of the existing circumstances, to eliminate the conditions contributing to the criminal activity. We think this duty arises primarily from criminal activities existing on the landlord's premises, and not from knowledge of general criminal activities in the neighborhood. Every person in society is subject to the risk of personal injury or property damage from criminal activity, both inside and outside his abode. The risk obviously varies with the time and locale. Since the landlord can affect the risk only within his own premises, ordinarily only criminal acts occurring on the landlord's premises, and of which he knows or should have known (and not those occurring generally in the surrounding neighborhood) constitute relevant factors in determining, in the particular circumstances, the reasonable measures which a landlord is under a duty to take to keep the premises safe.

In the present case, prior to late March of 1973 the

Sutton Place Apartments had experienced criminal activity on the premises, including five or six incidents of illegal entries into tenants' apartments. Within three months preceding Scott's death, two more apartments were burglarized, a car was stolen from the underground or lobby level garage, and there was a robbery and rape in one of the ground level stores. However, prior to Scott's death, the landlord had no knowledge that any tenant or invitee had been the victim of a crime involving physical harm (or threats) occurring in the common areas within the apartment building.

The above crimes occurred within the common areas despite the following precautions: (1) two closed circuit television cameras monitoring the basement of the building and rear of ground-level retail stores; (2) a night guard who patrolled the outside grounds and garage twice, and the remaining premises four times between 10 p.m. and 6 a.m.; (3) a switchboard operator who monitored the television system and main entrance; (4) a doorman who parked tenants' cars upon request. Moreover, the landlord had taken certain additional steps to protect tenants before Scott was killed.

These facts, as set forth in the District Court's certification order, should be determinative of the question, first, whether criminal activity existed in the common areas which would render their use unsafe, and, second, whether considering the circumstances there was a breach of the landlord's duty "of reasonable and ordinary care to keep the premises safe." *Macke Laundry Serv. Co. v. Weber*, 267 Md. at 429.

### (3)

Whether Maryland law imposes upon the landlord a duty to protect tenants from criminal activity in common areas within the landlord's control if he has undertaken specific measures to protect his tenants is the essence of the third certified question.

Scott contends that the defendants undertook to provide security to the tenants, thereby imposing upon themselves a

duty to make their undertaking adequate to protect the tenants. The defendants claim that their purpose in improving and adding to existing security devices and procedures was not to assure their tenants that they would be protected from criminal acts of third parties. They maintain that no duty exists under the particular circumstances of this case simply because they undertook to add to and modify existing security devices and procedures.

We think it clear that even if no duty existed to employ the particular level of security measures provided by the defendants, improper performance of such a voluntary act could in particular circumstances constitute a breach of duty. *See Penna. R.R. Co. v. Yingling*, 148 Md. 169, 129 A. 36 (1925). In view of the statement of facts certified by the District Court in this case, however, we decline to go beyond this elementary principle of tort law.

### (4)

We make these additional observations. Finding a duty and its breach is not conclusive of actionable negligence. Proximate (legal) causation is also a vital element of negligence, especially in relating the potential superseding cause of third party criminal activity to a breach of duty by the landlord.

The determination of proximate cause is subject to considerations of fairness and social policy as well as mere causation. *Peterson v. Underwood*, 258 Md. 9, 264 A. 2d 851 (1970). No Maryland cases have treated the causation issue in the present factual context. An examination of case authority in other jurisdictions reveals a split in authority. Some cases determine third party criminal activity to be the superseding cause of the injury, and thus find no landlord liability. *See Goldberg v. Housing Auth. of Newark, supra; Cornpropst v. Sloan*, 528 S.W.2d 188 (Tenn. 1975); *Gulf Reston, Inc. v. Rogers*, 207 S.E.2d 841 (Va. 1974); *Dwyer v. Erie Investment Co.*, 138 N.J. Super. 93, 350 A. 2d 268 (1975); *Smith v. ABC Realty Co.*, 71 Misc. 2d 384, 336 N.Y.S.2d 104 (Sup. Ct. 1972); *Knapp v. Wilson*, 535 S.W.2d 369 (Tex. Civ. App. 1976).

Other cases hold the landlord's negligence to be a proximate cause of the plaintiff's injury. In *Johnston v. Harris*, 387 Mich. 569, 198 N.W.2d 409 (1972), the Michigan Supreme Court found the element of causation in a cause of action for negligence by asserting that the landlord "enhanced the likelihood" of exposure to criminal assaults in a vestibule by failing to provide adequate lighting and locks. 198 N.W.2d at 410. *Braitman v. Overlook Terrace Corp.*, *supra*, involved a landlord's liability to a tenant for loss occasioned by theft after the landlord had notice of a defective lock to the tenant's apartment. The New Jersey Supreme Court found causation, using two routes: that it was foreseeable that criminal conduct would result from the landlord's negligence, and that a reasonable man would have recognized the "enhanced risk" that a defective lock would create. 346 A. 2d at 83, 84. In *Sherman v. Concourse Realty Corp.*, *supra*, the court determined that proximate cause "represents a policy decision . . . [which determines] how far removed an effect may be from its cause in fact for the actor nevertheless to be held legally responsible." 365 N.Y.S.2d at 244 (emphasis deleted). The court found that the landlord's neglect gave rise to the "stream of events" that culminated in the tenant's injuries. *See also Lillie v. Thompson*, 332 U. S. 459, 68 S. Ct. 140, 92 L. Ed. 73 (1947); *Kendall v. Gore Properties*, 236 F. 2d 673 (D.C. Cir. 1956); *Stribling v. Chicago Housing Authority*, 34 Ill. App. 3d 551, 340 N.E.2d 47 (1975).

The "enhanced risk" theory of *Johnston* and *Braitman*, *supra*, combined with a foreseeability requirement, is the solution offered by the Restatement of Torts (Second) § 448 (1965):

> "The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which offered an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should

> have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime."

In the present state of modern society, this would seem to be a fair solution of the causation problem in this context. A breach of duty by the defendant would result in his liability in the third party criminal activity context only if the breach enhanced the likelihood of the particular criminal activity which occurred. This is not a new concept in Maryland. In *Little v. Woodall,* 244 Md. 620, 224 A. 2d 852 (1966), a breach of warranty case concerning a carport which collapsed during a snowstorm, our predecessors stated "if the situation wrongfully created by the defendant increased the risk of damage through the operation of another reasonably foreseeable force, the defendant is liable for the ensuing loss." 244 Md. at 626. *See also Moran v. Faberge,* 273 Md. 538, 332 A. 2d 11 (1975). Thus, in *Johnston v. Harris, supra,* the inadequate maintenance of the common area enhanced the likelihood of an assault in the vestibule; in *Braitman v. Overlook Terrace Corp., supra,* the lack of repair of a defective lock enhanced the likelihood of a theft; in *Sherman v. Concourse Realty, supra,* the absence of a lock on the front door enhanced the likelihood of the robbery of the tenant in the common area.

> *Certified questions answered as herein set forth; costs to abide the result.*