EDWARD A. BUCK ET UX. *v.* ACME MARKETS, INC. ET AL.

[No. 1605, September Term, 1981.]

*Decided December 6, 1982.*

152

The cause was argued before MORTON, MASON and BISHOP, JJ.

*Edward C. Mackie,* with whom were *Glenn W. Trimmer* and *Rollins, Smalkin, Weston, Richards & Mackie* on the brief, for appellants.

*William M. Nickerson,* with whom were *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellee Acme Markets, Inc. *John Llewellyn Hone,* with whom were *David Preller, Sr., Preller & Preller* and *Lipshultz & Hone, Chartered* on the brief, for appellee Green Investigation Associates, Inc.

MASON, J., delivered the opinion of the Court. BISHOP, J., dissents and files a dissenting opinion at page 158 *infra.*

Appellants, Edward A. Buck and his wife (Buck), filed suit in the Superior Court of Baltimore City, alleging negligence against appellee, Acme Markets, Inc. (Acme) and Green Investigation Associates, Inc. (Green). After extensive discovery proceedings, appellees filed and were granted motions for summary judgment. Buck appeals and argues that the court erred in granting the motions for summary judgment because two material facts were genuinely in dispute.

1. Whether the area where appellant was injured was a public street; and
2. Whether the area where appellant was injured was within the possession and control of Acme Markets, Inc.

The record reveals that on 9 October 1978 between 7:30 and 8:00 p.m., Buck, while acting in the course of his employ-

ment for Taynton Freight Systems, delivered a truckload of food products to the Acme Markets Distribution Center in West Baltimore. Buck backed his tractor trailer into the loading dock of the Acme warehouse which abuts the westside of Smallwood Street. The trailer was positioned perpendicular to the loading dock, and the tractor was "jacknifed" toward Lafayette Avenue, leaving a sufficient area on Smallwood Street for other vehicles to pass. While the trailer was being unloaded, Buck was approached by two men who inquired if he needed help in unloading his truck. It was a common practice of independent truckdrivers to hire men off the street to assist in unloading their trailers. In fact, Buck recognized the two men as individuals who were hired by a companion driver to unload a trailer during a prior visit to Acme about six months earlier. After being told that no assistance was needed, one of the men told Buck that a window in the cab of his truck had been broken. When Buck went to the front of the tractor to inspect the cab window, he was shot in an attempted holdup.

## I

Buck's contention that there was a genuine dispute as to whether the shooting occurred on a public street was based solely on the deposition of Officer Paul Sharpley which, in relevant part, reads as follows:

> " 'A. . . . The loading dock would be right here. This is the Acme warehouse. What throws me off on this map is you got Smallwood Street. I don't know how Smallwood Street comes in there.
>
> . . . .
>
> A. I never knew, that would be the 900 block of Smallwood. As far as I know there is no 900 block of Smallwood. I never knew that. Is this an old map, sir?
>
> Q. Is there not a street that runs alongside the loading dock area?
>
> A. A street?

Q. Yes, that runs right up against the loading dock?

A. Here's a street I never knew was Smallwood Street. This is the Acme warehouse where the loading dock is. I'm familiar with this. . . .

Q. You do not know the name of the street on which you turned right?

A. I never knew it was Smallwood. You got me on that. Smallwood, as long as I've been up there I never knew it as Smallwood Street. It's never even been posted. I never seen a posted street sign. Of course, there's no traffic goes up there except for the Acme trucks. It's not a public street, let's put it that way. I mean it's not used by anybody but Acme warehouse.

Q. You say this is not a public street?

A. As far as I know. You see, you are showing me Smallwood Street. I never knew that was Smallwood Street as long as I've been up there. I've been there 24 years and I never knew that was Smallwood Street.

. . . .

A. I was not familiar with Smallwood Street there. If I got a call to the 900 block of Smallwood Street I would tell the dispatcher there's no such location.

. . . .

(The Witness) You really surprised me, sir, on Smallwood Street. I've handled hundreds of calls there, in that area, but I never knew that was Smallwood Street. I just wondered where the information comes from. If this is a 1938 map, I don't know, you know, this could be an old map. Of course, I don't know how old the Acme warehouse is either.

. . . .

Q. And after having looked at the map that Mr.

Nickerson exhibited and based on your 23 years of experience in that district, did you consider that loading dock area Smallwood Street?

 A. No, sir.' "

The evidence submitted by Acme, which was undisputed, showed that Buck was shot on a public street, that title of the street was vested in the Mayor and City Council of Baltimore, and that the street was designated on city plats as the 900 block of Smallwood Street.

We think that Officer Sharpley's lack of knowledge that the street where the shooting occurred was a public street, i.e., 900 block of Smallwood Street, was completely irrelevant and lacked sufficient evidentiary value to create a triable issue of a material fact.

## II

Buck also argues that there was a genuine dispute as to whether the area where he was injured was within the exclusive possession and control of Acme. The only evidence in the record that lends any support to this exclusive possession and control argument is that part of Officer Sharpley's deposition which states: "Of course, there's no traffic goes up there except for the Acme trucks. It's not a public street, let's put it that way. I mean it's not used by anybody but Acme warehouse."

Acme did not deny that it uses a substantial portion of Smallwood Street in conducting its business, but it denied it had exclusive control and possession of the street or that it was responsible for vehicular or pedestrian security on the street. Regarding Acme's possession and control of the area, a pertinent part of the deposition of William V. Skarzinski, Distribution Manager, reads as follows:

> "Q. And isn't it true, that Acme was almost the exclusive user of all of that area where the loading docks are located, north from Lafayette Avenue up to Mosher Street?
>
> . . . .

A. No, they weren't.

Q. Who else used it?

A. The public. There was no way I could keep the public from driving through there, or anybody else. They drove cars through there, they walked through there. It was a public street, is what it is.

. . . .

Q. And would you agree that 90 per cent or more of the traffic, through, in, or out of that area, involved the business of Acme?

. . . .

A. That is tough. I couldn't — I would say Acme had a good portion of it, but I wouldn't venture to say 90 percent.

Q. What would you say?

A. Maybe we could go — we could probably stretch it to 80."

In addition, Vernon Green, President of Green Investigation Associates, stated in his deposition and answers to interrogatories that his agency did not have the responsibility for keeping the area clear of loiterers, nor did it have a right to control vehicular traffic on the public streets surrounding Acme. If problems occurred on the public streets, the Police Department would be called.

As further evidence of Acme's lack of ownership and control of Smallwood Street, exhibits in the record show that Acme attempted to obtain permission from the City of Baltimore, before and after the shooting of Buck, to close Smallwood Street. The record also shows that on 9 January 1980, pursuant to a right of entry agreement with Baltimore City, Acme was given permission to close Smallwood Street between Lafayette Avenue and Mosher Street.

Again, we think that Officer Sharpley's unsupported assertion, i.e., "Of course, there's no traffic goes up there except for Acme trucks. It's not a public street, let's put it that way. I mean it's not used by anybody but Acme

warehouse" lacked sufficient evidentiary value to establish the existence of a genuine dispute as to a material fact. "[F]acts proffered in opposition to the granting of a motion for summary judgment must not only be detailed and precise, but must be admissible in evidence, if there is to be a finding that there is a genuine dispute as to a material fact." *Shaffer v. Lohr,* 264 Md. 397, 404 (1972). Buck's bald allegation did not meet this test. Accordingly, we find that there was no dispute as to any material fact.

We now determine whether the trial court properly applied the law to the undisputed facts, which are as follows: That Buck was shot on a public street during an attempted robbery; that Acme used a substantial portion of this street in conducting its business, and that prior to this incident Acme had knowledge of numerous criminal acts that had occurred on its premises and the public streets in the surrounding area. Without citing any authority, Buck, in essence, argues that Acme's substantial use of the street on which he was shot by a third party makes Acme liable for his injuries irrespective of who held legal title to the street. We disagree.

In this state a proprietor of a commercial establishment owes a duty to a business invitee to maintain the premises in a reasonable safe condition and give warning of latent or concealed perils. *Lloyd v. Bowles,* 260 Md. 568, 572 (1972). This, however, does not mean that the proprietor has a duty to correct a hazardous condition created by strangers on an abutting public way or sidewalk. *See Jenkins v. Atlantic & Pacific Tea Co.,* 128 F. Supp. 169 (D. Md. 1955); *Matyas v. Suburban Trust Co.,* 257 Md. 339 (1970). *See* also *Litz v. Hutzler Bros. Co.,* 20 Md. App. 115, 123 (1974), where this Court rejected plaintiff's proffer showing that on three other occasions patrons of the store were criminally attacked by third parties on the public street immediately prior to their leaving or entering the store. We said "the incidents reflected in appellant's proffer took place on a public street — not the premises of the appellee. The appellee had no duty to patrol the public way. That is the proper subject for police action."

Even with respect to the recognized duties owed by a landlord to tenants for injuries occurring in common areas under the landlord's control, the courts have not suggested anything closely approaching the liability that Buck is here attempting to impose upon Acme in regard to injuries occurring on an abutting public street. In *Scott v. Watson,* 278 Md. 160, 169 (1976), the Court of Appeals said:

> ". . . that Maryland law does not impose upon the landlord of an urban apartment complex a special duty to tenants to protect them from the criminal acts of third parties committed in common areas within the landlord's control."

Moreover, the "special use" doctrine which holds "that if an abutting owner, by virtue of some extraordinary use that he makes of the walkway, creates a special hazard on it, he and not the body politic is answerable for any damage caused by that special hazard," *Bethesda Armature Co. v. Sullivan,* 47 Md. App. 498, 501 (1981), is inapposite. Although the "special use" doctrine covers a broad spectrum of circumstances, by no stretch of the imagination would it cover the facts in the instant case. We know of no authority nor has any been called to our attention which supports Buck's theory that a business enterprise that uses a substantial portion of the street in conducting its business is liable to invitees for injuries they sustain on the public street as a result of criminal acts by third parties.

For the reasons stated herein, we conclude that the trial court did not err in granting motions of summary judgments to appellees, Acme Markets, Inc. and Green Investigation Associates, Inc.

> *Judgments affirmed; costs to be paid*
> *by appellants.*

*Bishop, J., dissenting:*

Even though Mr. Buck was not shot on the loading dock, but beside his cab, I do not think that the difference of a few

yards necessarily disposes of his claim. The narrow issue to be decided on appeal was not whether appellees, Acme and Green, were responsible in tort for Mr. Buck's injury, but whether appellants should have been allowed to prove such responsibility by presenting their case in chief. The fact that the injury occurred several yards off Acme's property is relevant to determination of responsibility, but does not warrant curtailing appellants' suit by summary judgment. There remain crucial questions of material fact: To what extent Acme exercised control over the area where the incident occurred, *Jenkins v. Great Atlantic and Pacific Tea Company,* 128 F. Supp. 69 (D. Md. 1955), and whether there was some special use to which Acme put the property which created an extraordinary hazard. *Bethesda Armature Co. v. Sullivan,* 47 Md. App. 498, 501 (1981).

In *Scott v. Watson,* 278 Md. 160 (1976), the Court of Appeals (Murphy, C.J.), adopted for Maryland the Restatement (Second) of Torts § 448 (1965) which provides:

> "The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime." 278 Md. at 172-73.

Chief Judge Murphy continues:

> "In the present state of modern society, this would seem to be a fair solution of the causation problem in this context. A breach of duty by the defendant would result in his liability in the third party criminal activity context only if the breach enhanced the likelihood of the particular criminal activity which occurred. This is not a new concept in Maryland. In *Little v. Woodall,* 244 Md. 620, 224 A.

2d 852 (1966), a breach of warranty case concerning a carport which collapsed during a snowstorm, our predecessors stated 'if the situation wrongfully created by the defendant increased the risk of damage through the operation of another reasonably foreseeable force, the defendant is liable for the ensuing loss.' 244 Md. at 626, 224 A. 2d at 855. *See also Moran v. Faberge,* 273 Md. 538, 332 A. 2d 11 (1975)." 278 Md. at 173.

Appellants seek an opportunity to present evidence that Acme officials knew of the high incidence of crime in the warehouse area, yet created a situation that foreseeably enhanced the likelihood of criminal activity there. Appellees adduced evidence generating a definite factual dispute as to whether Acme realized, or should have realized, that its use of the street abutting its warehouse reduced police protection and increased crime, necessitating better private security than was provided. Reports maintained by appellee Green Investigation Associates on the year prior to Mr. Buck's shooting describe dozens of crimes discovered in the warehouse area, usually involving persons trying to steal Acme goods (E. 15-18). A computer printout provided by the Baltimore City Police Department lists hundreds of index crimes in the area from January 1975 through 1978. Of these crimes, 224 were larcenies, 33 were robberies, and 21 involved physical injury to the victims.

There was also evidence that Acme's warehouse operation reduced police protection in the area. Acme had almost totally appropriated use of the block abutting its warehouse for unloading tractor-trailers, obstructing most public use of the street. (See Appendices 1 and 2). Appellants point out that knowledgeable persons believed the area was Acme's property; that it was not used as a public street "but was used exclusively by Acme Markets, Inc.; that the area was almost completely surrounded by buildings owned and occupied by Acme Markets, Inc.; and the exclusive use of a substantial part of the area called 'Smallwood Street' was pre-empted by actions of Acme Markets, Inc." There was

evidence that this caused police to conclude that the street was not public property requiring regular patrols.

The deposition testimony of Officer Paul Sharpley of the Baltimore City Police Department, who investigated the attempted robbery, shows that there is a genuine dispute as to these questions:

" 'A. . . . The loading dock would be right here. This is the Acme warehouse. What throws me off on this map is you got Smallwood Street. I don't know how Smallwood Street comes in there.

\* \* \*

A. I never knew, that would be the 900 block of Smallwood. As far as I know there is no 900 block of Smallwood. I never knew that. Is this an old map, sir?

Q. Is there not a street that runs alongside the loading dock area?

A. A street?

Q. Yes, that runs right up against the loading dock?

A. Here's a street I never knew was Smallwood Street. This is the Acme warehouse where the loading dock is. I'm familiar with this. . . .

Q. You do not know the name of the street on which you turned right?

A. I never knew it was Smallwood. You got me on that. Smallwood, as long as I've been up there I never knew it as Smallwood Street. It's never even been posted. I never seen a posted street sign. Of course, there's no traffic goes up there except for the Acme trucks. It's not a public street, let's put it that way. I mean it's not used by anybody but Acme warehouse.

Q. You say this is not a public street?

A. As far as I know. You see, you are showing me

Smallwood Street. I never knew that was Smallwood Street as long as I've been up there. I've been there 24 years and I never knew that was Smallwood Street.

* * *

A. I was not familiar with Smallwood Street there. If I got a call to the 900 block of Smallwood Street I would tell the dispatcher there's no such location.

* * *

(THE WITNESS) You really surprised me, sir, on Smallwood Street. I've handled hundreds of calls there, in that area, but I never knew that was Smallwood Street. I just wondered where the information comes from. If this is a 1938 map, I don't know, you know, this could be an old map. Of course, I don't know how old the Acme warehouse is either.

* * *

Q. And after having looked at the map that Mr. Nickerson exhibited and based on your 23 years of experience in that district, did you consider that loading dock area Smallwood Street?
A. No, sir.' "

The record also contains the Baltimore Police Department report, dated 9 October 1978, of the shooting of Edward Buck. This report, designated "Exhibit O," prepared by police detectives, states that Officer Sharpley responded to the shooting which had occurred at 2140 W. Lafayette Avenue. The report goes on to state:

"The crime scene is located at 2140 W. Lafayette Avenue, which is in a mixed residential and com-

mercial neighborhood. 2140 W. Lafayette Avenue is a warehouse for Acme Foods. The actual shooting scene is located on the west side of 2140 W. Lafayette Avenue, which is the loading dock area."

Acme, evidently aware of the high incidence of criminal activity and the inadequacy of police protection in the warehouse area, had, for some time prior to Mr. Buck's shooting, attempted to fence in the street on which he was shot. Erection of the fence was authorized in 1980, two years after the shooting. Appellants sought to prove that Acme, having foreseeably raised the risk of criminal activity in the area abutting the warehouse, bore some responsibility for providing better private security service in the area than it did pending erection of the fence. I suggest that this issue should not have been resolved by summary judgment.

*Summary Judgment*

As we said in *Barb v. Wallace,* 45 Md. App. 271, 278 (1980):

> "The facts here are susceptible of more than one permissible inference and the choice between these inferences should be made by the trier of fact and should not be resolved on a motion for summary judgment. *Washington Homes v. Interstate Land Development,* 281 Md. 712, 382 A. 2d 555 (1978)."

The credibility of that evidence and the inferences to be drawn from it were for the jury, not the judge, since no issue of fact or credibility of witnesses may be determined in a summary judgment proceeding. *Berkey v. Delia,* 287 Md. 302, 326 (1980); *Impala Platinum Limited v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 326 (1978); *Merchants Mortgage Company v. Lubow,* 275 Md. 208, 217-218 (1975); *Wolfe v. Lamar & Wallace, Inc.,* 261 Md. 174, 178 (1971).

In *Merchants Mortgage, supra,* Judge Singley pointed out that

> ". . . summary judgment procedure under Rule 610 is not a substitute for trial, but rather is a deter-

mination whether there are disputed issues of fact
that should be tried." (Citations omitted.) 275 Md.
at 217.

*Accord, Coffey v. Derby Steel Co., Inc.,* 291 Md. 241, 247
(1981).

An issue of fact to be determined at trial was whether Acme
put the street adjoining its warehouse to a special use, fore-
seeably increasing the probability of criminal activity there.

### Responsibility of Abutting Landowner

I would hold that there was sufficient evidence before the
trial court on this issue to require a finding of fact rather
than a conclusion of law. Because a landowner does not
usually affect the risk off his property, he is not generally
liable for injuries suffered on abutting land. This general
rule, relied upon by the majority, is qualified if the land-
owner raises the risk of injury off his land. This important
qualification is exemplified by the special use doctrine,
which

"... holds that if an abutting owner, by virtue of
some extraordinary use that he makes of the
walkway, creates a special hazard on it, he and not
the body politic is answerable for any damage
caused by the special hazard. *See Citizens Savings
Bank of Covington, supra,* 174 Md. 633; Restate-
ment of Torts 2d § 350."

*Bethesda Armature Co. v. Sullivan,* 47 Md. App. 498, 501
(1981). *See Flynn v. Canton Co. of Baltimore,* 40 Md. 312,
326 (1874); *Gunther v. Dranbauer,* 86 Md. 1 (1897). *See
generally* Annot., 88 A.L.R. 2d 331 (1963).

This case is governed by *Citizens Savings Bank of
Baltimore v. Covington,* 174 Md. 633 (1938), in which the
plaintiff was injured when she tripped over the handle to the
defendant bank's cellar door, set in the sidewalk. The Court
of Appeals wrote:

"The inference is that some meddler raised the

handle and left it in such a position as to make it dangerous to pedestrians. Under these circumstances the question is whether there is sufficient evidence of the Citizens Savings Bank's responsibility for the case to go to the jury." *Id.* at 635.

The Court then set out what is still the law in Maryland:

"The rule of the liability of an individual with respect to defects in a street, as stated in *Cooley on Torts* (4th Ed.) sec. 452, is: 'If an individual, whether the adjoining owner or not, and whether the fee in the public way is in himself or in the public, does any act which renders the use of the street hazardous or less secure than it was left by the proper public authorities — as by excavation made in the sidewalks, or by unsafe hatchways left therein, or by opening or leaving open areaways in the traveled way, or by undermining the street or sidewalk — he commits a nuisance, and he is liable to any person who, while exercising due care, is injured in consequence." *Id.* at 635-36.

The defendant bank argued, as does Acme now, that it could not be liable for third-party intentional torts off its property. The Court responded:

"There is no question here of the right of the defendant to maintain a cellar-door in the sidewalk, but it is a privilege to be enjoyed without danger of injury to pedestrians, who are only required to use ordinary care in their use of the street. The owner is not required, in order to impose liability, that he should know of the misplaced handle, used in the raising or lowering of the door. If the device was so constructed or left in such condition that it may be disturbed by the mischievous or malicious, then the negligence is imputable to the owner. ... We, therefore, are of the opinion that the trial court properly refused to take the case from the jury for want of legally sufficient evidence of the defendant's negligence or failure of duty." *Id.* at 637-38.

Thus, if a business obstructs the public way for its own benefit, it assumes the increased risk generated by its obstruction. *See State ex rel. Thompson v. Emerson & Morgan Coal Co.,* 150 Md. 429, 440 (1926). "It is a risk the abutting property owner runs for the enjoyment of such a privilege." *Citizens Savings Bank v. Covington, supra* at 638. This is a cost of doing business, rightly shifted to the enterprise that raises the risk.

As stated in *Davis v. Pecorino,* 350 A. 2d 51, 53 (N.J. 1975):

> "An abutting landowner is responsible for dangerous conditions created as a result of his special use of the public sidewalk for his particular benefit. A sidewalk is intended primarily for pedestrians, and an abutting owner who invades the public easement exclusively for his own benefit is responsible for the resultant hazardous condition."

The opinion continues:

> "Here the defendant owner of the gasoline service station invited motor vehicles to drive back and forth across the sidewalk. It was at his request that the public's vehicles rode across the walk, an action which led to the dangerous condition. This traffic was directly beneficial to his business and enured to his economic benefit. The defendant was in the best position to prevent, eliminate or ameliorate the hazardous condition created by his patrons, a condition which otherwise would not have existed at that time and place. ... As between the two — an innocent pedestrian and a commercial enterprise whose operation caused the danger to exist — fairness and equity demand that the business entity be obligated to meet a reasonably prudent standard by correcting or removing the impediment in the public way." *Id.* at 55.

*Accord, District of Columbia v. Texaco, Inc.,* 324 A. 2d 690, 692 (D.C. App. 1974).

Had Acme's loading dock projected into the street, creating a dangerous obstruction that injured a pedestrian, Acme's negligence would clearly have been an issue for the jury to determine. *Citizens Savings Bank of Baltimore v. Covington, supra; District of Columbia v. Texaco, Inc., supra; Jensen v. Estate of Johnson,* 230 N.W. 2d 61 (1975) (pipe protruding from ground); *Crosswhite v. City of Lincoln,* 175 N.W. 2d 908 (1975) (box protruding above sidewalk). If Acme's operation contributed to a third party's negligence — *e.g.,* contributing to an automobile accident — the company's responsibility would have been a jury question. *Johnson v. City of Rockford,* 182 N.E. 2d 240 (Ill. 1962). *See Salomone v. Boulanger,* 342 A. 2d 61 (1975). Or if Acme's obstruction of the street prevented police from coming to the assistance of persons injured by crime, a jury could certainly have determined the company's liability. *See* Restatement (Second) of Torts § 328 (1965).

In this case, as in *Central Savings Bank of Baltimore v. Covington, supra,* a jury could have found that Acme's special use of the street abutting its loading dock created a condition likely to be misused by the criminal element. The jury could find that Acme officials knew of the crime condition surrounding their warehouse, yet used the area in a manner that reduced police protection and increased criminal activity. Consequently, Acme's obstruction of the street may have foreseeably enhanced the likelihood of criminal assaults, rendering it responsible, under the principles of *Scott v. Watson, supra,* for providing better private security protection than it did. Determination of appellees' liability may ultimately turn on the persistence with which they drove loiterers away from the loading dock area. *Compare Jenkins v. Great Atlantic & Pacific Tea Co., supra* (store owner persistently dispersed persons outside store) with *Horner v. Penn Fruit Co.,* 82 A.2d 313 (Pa. 1951) (store owner did not persistently disperse persons outside store; held liable when one injured patron leaving store).

A jury could have found that Acme made an extraordinary, special use of the street to benefit its warehouse operation, creating a foreseeable hazard of increased criminal activity. Consequently, appellants should not be foreclosed by summary judgment merely because Mr. Buck was shot several yards from Acme's property, instead of on its property. Significant issues of negligence and proximate causation remain to be decided. I would reverse the summary judgment in favor of appellee Green Investigation Associates for the same reasons.