Roger EMBER and Jane Ember, Appellants (Plaintiffs),

v.

B.F.D., INC., Appellee (Defendant).

No. 2–883–A–291.

Court of Appeals of Indiana, Second District.

March 13, 1986.

⚷34

Earl Raskosky, Fort Wayne, for appellants.

John F. Lyons, John M. Clifton, Jr., Thomas M. Kimbrough, Barrett, Barrett & McNagny, Fort Wayne, for appellee.

BUCHANAN, Chief Judge.

## CASE SUMMARY

Plaintiffs-appellants Roger Ember (Ember) and his wife, Jane, appeal the trial court's entry of summary judgment in favor of defendant-appellee B.F.D., Inc., doing business as O'Sullivan's Italian Pub (the Pub), claiming the trial court erroneously found that the Pub did not breach any duty owed Ember when he was attacked and beaten by three assailants across the street from the Pub.

We reverse and remand.

## FACTS

The facts most favorable to the nonmoving party, as revealed by the pleadings and depositions before the trial court, show that the Pub is a corporation which began operating a tavern in July of 1978. The Pub is situated in an older, mixed residential and commercial neighborhood of Fort Wayne at the corner where Runnion Street deadends into Main Street. The building is surrounded by a sidewalk along both streets, and Main Street is also bounded by a sidewalk on the opposite side of the street from the Pub. In addition, there is a parking lot directly across Main Street from the Pub. The ownership of this lot is not established. Soon after opening, the Pub became known as the "hottest bar in town." *Record* at 48. As the crowds increased during the first months of business, the Pub received complaints from nearby residents and the local neighborhood association due to problems attributed to the Pub's patrons.

As related in his deposition, Todd M. Davis (Davis), a co-manager and shareholder indicated the complaints centered around instances of excessive noise, urination in the parking lot, bottle throwing, and "things that went along with the crowds"

generated by the Pub's business. *Record* at 40. Davis knew of several instances of criminal activity on the streets adjacent to the building. The building next door to the tavern was broken into, and at least three or four cars were broken into while parked in the rear parking lots or on adjacent streets. Davis was also aware of at least five or six incidents of violence, both inside and outside the tavern.

After its first year of operation, the Pub experienced difficulty in renewing its liquor license. In the fall of 1979, the Pub supported its application for renewal with a letter to the Indiana Alcoholic Beverage Commission detailing the complaints against the Pub's operation and the solutions employed by the Pub owners to that date. The letter revealed that large trash cans were placed outside the tavern and that two youths were employed to pick up trash daily to alleviate the presence of bottles, cans, and other litter. To remedy parking problems, the existing parking lot behind the tavern was improved and warnings and citations were issued to illegally parked vehicles; furthermore, attempts to lease an adjoining lot were promised if parking problems continued. Enlargement of the restroom facilities and a police officer's presence outside the tavern deterred urination outside the building. The Pub employed two uniformed police officers, one stationed at the door and one to maintain order outside, to solve the excess noise problem. With regard to the officer posted outside, the letter to the Indiana Alcoholic Beverage Commission maintained that "[a] uniformed police officer is on duty from 10:00 p.m. to closing every Wednesday through Saturday and Monday and Tuesday as needed. *It is the responsibility of the officer to maintain order in* the parking lot as well as *any adjoining streets.*" *Record* at 75 (emphasis supplied).

The Pub's letter also represented that a solution had been found to a complaint lodged against the Pub with the Ombudsman's Office, a city agency, and the Mayor of Fort Wayne. In response to the com-

plaint, the Pub's owners met with the neighborhood association and Mayor's office. As a result of that meeting, the Pub distributed this flyer in November, 1980:

"4 2 2 – 5 8 9 6

If something in the neighborhood is disturbing you or someone's property and you wish for O'Sullivan's to try to correct the problem . . . even if it doesn't pertain to us . . . we would be responsive and helpful if you will do the following:

422–5896    4 2 2 – 5 8 9 6

CALL AND ASK FOR A PUB OWNER OR THE MANAGER . . . AND ASK HIM HIS NAME STATE YOUR NAME AND ADDRESS

DESCRIBE WHAT IS HAPPENING AND WHERE

GIVE ANY DESCRIPTIONS OF PEOPLE OR VEHICLES YOU MAY HAVE NOTICED

STAY INSIDE YOUR HOME UNLESS YOU WISH TO PARTICIPATE

CALL CITY POLICE IF IT IS A SERIOUS INCIDENT . . . BUT GENERALLY . . . CALL US FIRST . . . WE HAVE A POLICE OFFICER AFTER 10:30 and SEVERAL WILLING EMPLOYEES PRIOR TO THAT

CALL THE PUB AGAIN IF NO ACTION HAS CORRECTED THE PROBLEM WITHIN SEVERAL MINUTES

IF PUB LINE IS BUSY KEEP TRYING . . . WE TRY TO LIMIT USE OF OUR PHONE

Sometime during the next few days following an incident one of the owners of the Pub will contact you to see if the incident was resolved or if there is anything else that needs to be done . . . you may just wish to let us know how we handled it, etc. If we fail to do this simply call the pub and remind us to give you a report on it.

4 2 2 – 5 8 9 6    4 2 2 – 5 8 9 6    4 2 2 – 5 8 9 6"

*Record* at 74 (emphasis supplied). Davis indicated that the written flyer was distributed "to the neighborhood association, *anybody that wanted it.*" *Record* at 45 (emphasis supplied). Davis additionally assured the neighborhood residents:

"We told them that we would continue to do what we had been doing the entire time, and that was to have a police officer on duty in the evenings and to continue to do as we had always done, to walk around ourselves when we were working, at sporadic times, *and check the parking lots in the area and so forth for any kind of thing that was happening.*"

*Record* at 46–47 (emphasis supplied). Indeed, the Pub maintained police and civilian patrols outside its premises due to its acknowledged adverse effect on the immediate neighborhood. Davis admitted that officers employed by the bar had, in fact, rendered assistance with problems in the neighborhood which occurred off the Pub's premises. "[T]here was one down the street, and it had nothing to do with us . . . one of the police officers that worked for us handled it." *Record* at 43. This officer was posted at the door "and went outside to help with a neighborhood problem down the street." *Record* at 43.

The tavern employed off-duty police officers as security every night until the beginning of 1981, when the crowds began to decrease and security measures were curtailed. However, security was employed when bands were scheduled to appear or on certain holidays, such as St. Patrick's Day, when large crowds were anticipated. Although security was routinely expected to begin duty around 10:30 p.m., due to the large crowd expected on St. Patrick's Day, 1981, an off-duty police officer was hired to begin work at 8:00 p.m. In addition, Davis testified that he personally patrolled outside the building more than usual due to the crowds. The police officer reported late. At 8:00 p.m., Davis was the only person on patrol, and he was in the parking lot behind the Pub.

Ember, an off-duty policeman himself, arrived at the Pub at approximately 8:00 p.m. He was a regular patron of the establishment, visiting the tavern on a weekly basis. On this particular evening, Ember had arranged to meet his wife and another couple at the Pub to celebrate St. Patrick's Day. When Ember arrived, he observed a noisy crowd of twenty to thirty persons

consuming alcoholic beverages outside the Pub while awaiting entry. The crowd was described as a line stretching around the side of the building. The Pub's only parking lot was located at the rear of the building. The Pub apparently did not own or lease any other parking lot in the area although patrons including Ember routinely used other business lots while frequenting the tavern. There is no indication in the record that other area businesses were open at the time in question. To obtain a vantage point so as to locate his wife and friends in the crowd, Ember parked his automobile straddling the sidewalk directly across Main Street from the Pub's entrance. As alleged in the complaint, Ember was about to cross the street to the tavern when three men approached Ember and began beating on his automobile. *Record* at 11. The trio then walked on toward their vehicle which was parked in the grass beyond the sidewalk at the end of the block. Ember left his automobile and approached the group approximately twenty feet away. Remarks by Ember's assailants during the ensuing argument indicate they believed Ember to be another regular patron of the tavern. In any event, the men attacked Ember, inflicting severe injuries which required hospitalization. The attack took place at or near the assailants' parked vehicle, and the assailants escaped. At the time of the initial confrontation, and during the attack, Davis was patrolling the Pub's rear parking lot and the off-duty police officer had not yet arrived for duty.

On November 6, 1981, Ember filed a complaint against the Pub alleging negligence; Jane also sought damages for loss of consortium. Based upon the pleadings and the depositions of Ember and Davis, the trial court rendered summary judgment in favor of the Pub concluding there was no genuine issue of material fact and the Pub "did not breach any duty" toward Ember. *Record* at 173–75.

## ISSUE

One issue is raised for review:

Whether the trial court properly granted summary judgment on the theory that, as a matter of law, the Pub did not breach any gratuitously assumed duty to protect persons outside the Pub's premises?

## DECISION

PARTIES' CONTENTIONS—Ember argues the Pub's conduct constituted the gratuitous assumption of a duty to protect patrons on the streets and parking lots adjacent to the Pub and the Pub breached this gratuitously assumed duty by failing to have an officer on duty, and by permitting an unruly crowd to congregate outside the tavern.

The Pub denies any duty to protect persons on public ways adjacent to its premises. Even if it assumed a gratuitous duty, it says that Ember did not rely on its representations to provide security which is fatal to any cause of action for negligence. CONCLUSION—The trial court erred in entering summary judgment on the basis that there could be no gratuitous assumption of a duty to Ember.

Resolution of this appeal does not necessitate a lengthy recitation of the body of law surrounding summary judgment. *See* Ind. Rules of Procedure, Trial Rule 56. We do recognize as pertinent to our conclusion the conventional wisdom that summary judgment is rarely appropriate in negligence actions. *Verplank v. Commercial Bank* (1969), 145 Ind.App. 324, 251 N.E.2d 52. The issues of negligence, causation, and reasonable care can rarely be determined as a matter of law; rather, they are most appropriately left for determination by the trier of fact. *Bassett v. Glock* (1977), 174 Ind.App. 439, 368 N.E.2d 18. Such is the case here.

Negligence actions may be premised on the imposition of a legal duty to aid one in peril. *E.g. Perry v. Northern Ind. Pub. Serv. Co.* (1982), Ind.App., 433 N.E.2d 44, *trans. denied.* Normally there is no legal duty to come to the aid of a stranger. The imposition of a legal duty to aid or protect

another person is dependent upon the existence of a special relationship.

■ Familiar relationships imposing a duty of reasonable care include those of landowners to invitees, common carriers to passengers, and innkeepers to guests. Of particular interest here is the duty of a tavern owner, engaged in the sale of intoxicating beverages, to exercise "reasonable care to protect guests and patrons from injury at the hands of irresponsible persons whom they knowingly permit to be in and about the premises." *Glen Park Democratic Club, Inc. v. Kylsa* (1966), 139 Ind. App. 393, 396, 213 N.E.2d 812, 814. The duty of a tavern owner generally includes provision of an adequate staff to police the premises and to control disorderly conduct. *E.g. Slawinski v. Mocettini* (1963), 217 Cal. App.2d 192, 31 Cal.Rptr. 613.

As urged by the Pub, however, premises liability of a tavern owner for injuries to patrons does not extend to third persons beyond the boundaries of the tavern's premises. However, the inquiry does not stop there. The duty of a tavern owner to persons beyond the boundaries of a tavern may be assumed.

### Gratuitous Assumption

■ Justice Cardozo has been frequently quoted on this subject: "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *H.R. Moch Co. v. Rensselaer Water Co.* (1928), 247 N.Y. 160, 167, 159 N.E. 896, 898 (quoting *Glanzer v. Shepard* (1922), 233 N.Y. 236, 239, 135 N.E. 275, 276); *accord W. Prosser, Handbook of the Law of Torts* § 345 (4th ed. 1971). Indeed, the gratuitous assumption of a duty was succinctly expressed in early Indiana case law: "Although no assistance be exacted under the law, if any be tendered it must not be negligently rendered." *Pere Marquette R. Co. v. Strange* (1908), 171 Ind. 160, 169, 84 N.E. 819, 823. The assumption of a duty creates the requisite special relationship between the parties and the corresponding duty to act in the manner of a reasonably prudent person. *Plan-Tec, Inc. v. Wiggins* (1983), Ind.App., 443 N.E.2d 1212.

■ Indiana recognizes the gratuitous assumption of duty by one who, through affirmative conduct or agreement, assumes and undertakes a duty to act. *Board of Comm'rs v. Hatton* (1981), Ind.App., 427 N.E.2d 696, *trans. denied.* Three recent Indiana cases demonstrate the course of affirmative conduct which will support the gratuitous assumption of duty. In *Perry, supra,* an independent contractor's employee working at a NIPSCO plant sustained injuries after he was requested by the contractor's foreman to weld a fan housing 20 feet above the ground without the aid of scaffolding or other safety apparatus. In the absence of a contractual duty or the maintenance of hazardous instrumentalities on NIPSCO's premises, the trial court entered summary judgment in favor of NIPSCO, finding NIPSCO owed no duty of reasonable care relative to job safety. The appellate court reversed. Although the contract did not give NIPSCO the right to control the manner in which the contractor performed his work, NIPSCO may have nevertheless assumed control of safety on the job. Specifically, NIPSCO held regular safety meetings and employed safety inspectors on the job site. NIPSCO's affirmative conduct, which had no contractual basis, raised a genuine issue of fact regarding the assumption of a duty to supervise safety in the manner of a reasonably prudent person. *Id.,* at 49–50. Similarly, in *Plan-Tec, supra,* the defendant construction manager appointed a safety director, held safety meetings, ordered safety precautions, and conducted safety inspections on a construction site. Although the construction manager was not contractually responsible for safety on the job, its conduct was sufficient to present a jury question on whether the manager assumed a duty to provide a safe place to work. *Id.* at 1220; *see also Clyde E. Williams & Assocs. v. Boatman* (1978), 176 Ind.App. 430, 375 N.E.2d 1138 (engineering firm's as-

sumption of duty to supervise safety at construction site was a question of fact).

This trilogy of cases clearly demonstrates that the actor's affirmative conduct and representations must be evaluated by a jury to determine whether a duty was gratuitously assumed.

■ The facts in the record before us are contained in the pleadings and the depositions of Ember and Davis. If considered most favorably to the nonmoving party, Ember, the facts raise a reasonable inference that the Pub has assumed a duty to patrol the area surrounding its premises and to protect persons in its vicinity from criminal or harmful activity.[1] The Pub distributed a flyer emblazoned with its phone number which implored area residents to call the Pub before the police in case of problems in the neighborhood. The flyer clearly expressed the Pub's concern if "something in the neighborhood is disturbing you or someone's property ... even if it doesn't pertain to" the Pub. *Record* at 74. Davis, one of the Pub's co-owners and managers, admitted the flyer was distributed "to the neighborhood association, anybody that wanted it." *Record* at 45. Thus, the Pub contemplated wide dissemination of a broad offer of help to persons in the vicinity of its business. Additionally, Davis had assured neighborhood residents that members of the Pub staff would patrol the parking lots *in the area* to check for "any kind of thing that was happening." *Record* at 46–47. The Pub had also written a letter to the Indiana Alcoholic Beverage Commission detailing the steps it had taken to preserve peace and order in the *vicinity* of its business establishment. Finally, in the past a security officer from the Pub had in fact helped with a neighborhood problem even though, in Davis's own words, "it had nothing to do with us [the Pub]" and occurred *down the street* from

the tavern. *Record* at 43. Thus, the Pub's representations and conduct do give rise to the reasonable inference that it assumed a duty to patrol the area surrounding its premises and to protect persons (including patrons) within that vicinity from criminal activity. The exact scope of any such duty gratuitously assumed under these particular circumstances *is a matter for jury determination* based on an evaluation of the Pub's conduct and representations. *Hatton, supra*, at 699–700.

■ Another aspect of whether a duty has been gratuitously assumed is whether the defendant's conduct, or lack of it, constituted misfeasance or nonfeasance. Misfeasance is negligent conduct or active misconduct and will support liability for a breach in the performance of a gratuitously assumed duty. *Plan-Tec, supra*, at 1221. On the other hand, nonfeasance is a *complete* omission or failure to perform. *Id.* at 1220. As the Pub correctly argues, liability for nonfeasance, in connection with a gratuitous duty, is confined to situations when the beneficiaries detrimentally relied on performance, *Hatton, supra*, at 700, or when the actor increased the risk of harm. *Plan-Tec, supra*, at 1221.

■ The rule barring liability for nonfeasance is rooted in the reluctance to impose a duty of care absent a special relationship between the parties. For example, an expert swimmer is not required to aid a drowning person, *Handiboe v. McCarthy* (1966), 114 Ga.App. 541, 151 S.E.2d 905, nor is a city under any affirmative duty to aid persons found helpless on its streets. *Warren v. City of Indianapolis* (1978), 176 Ind.App. 481, 375 N.E.2d 1163. Similarly, a mere gratuitous promise without more is insufficient to impose a duty of care. *W. Prosser, supra*, at 344. For example, county liability was denied in *Hatton, su-*

---

**1.** The failure to guard against foreseeable criminal conduct due to the act or omission of the actor may be negligence. *See* Restatement (Second) of Torts § 302B comment e, illustration 3 (1965):

"The A Company makes a business of conducting tourists through the slums of the city. A employs guards to accompany all parties to protect them during such tours. B goes upon such a tour. While in a particularly dangerous part of the slums the guards abandon the party. B is attacked and robbed. The A Company may be found to be negligent toward B."

*pra,* at 700, when a bicyclist was struck by a motorist whose vision was obscured by tall natural growth on a curve in the road. The county's failure to mow the curve was characterized as misfeasance although the county voluntarily mowed other portions of the roadway. Since the county had never undertaken to mow the curve at issue, its *complete* failure to mow the curve was mere nonfeasance.

Conversely, if affirmative conduct evidences an undertaking to perform the gratuitous service, negligence in the form of an omission to act when a reasonable person would act is nonetheless characterized as misfeasance. Professor Prosser has thereby recognized the fallacy in defining the distinction between misfeasance and nonfeasance as between mere action and inaction:

> "Failure to blow a whistle or to shut off steam, although in itself inaction, is readily treated as negligent operation of a train, which is affirmative misconduct; an omission to repair a gas pipe is regarded as negligent distribution of gas; and failure to supply heat for a building can easily become mismanagement of a boiler."

W. Prosser, *supra,* at 340 (footnotes omitted). If one has engaged in affirmative conduct evidencing an undertaking to provide a safe place to work, the failure to enforce safety measures, otherwise an "omission," will nonetheless support liability for the breach of a gratuitously assumed duty. *Perry, supra,* at 49–50 (failure to provide scaffolding); *accord Boatman, supra,* 176 Ind.App. at 435, 375 N.E.2d at 1141. The failure to adequately inspect equipment is likewise misfeasance although the inspection did not increase the risk of harm. *"Once performance is attempted,* the performer must act in the manner of a reasonably prudent person." *Plan-Tec, supra,* at 1221.

Cases such as these do not, for example, distinguish between failing to erect scaffolding and allowing the use of defective scaffolding when, in both instances, one has entered upon a course of conduct designed to undertake the duty to provide a safe place to work. Both the failure to provide scaffolding in *Perry,* and the failure to adequately inspect scaffolding in *Plan-Tec,* were negligent performance of a gratuitously assumed duty to provide a safe job site. The failure to do what a reasonably prudent person would do after taking control of a situation, i.e., after undertaking a duty to act, is nonetheless misfeasance.

In this case, we cannot characterize the Pub's failure to provide adequate security or to disperse or control an unruly crowd as nonfeasance. The evidence supports a reasonable inference that the Pub entered upon a course of conduct designed to undertake the duty to police the area in which Ember was attacked even at the moment Ember arrived. The jury must therefore determine whether the Pub gratuitously assumed a duty to patrol the adjacent areas and the scope of the duty assumed.

The question also remains for jury determination whether the Pub performed its gratuitous duty, to the extent assumed, in a reasonable manner.[2] The fact-finder must determine whether, for example, reasonable conduct would have dispersed the crowd or increased patrols at the Pub's entrance and on the adjacent sidewalks, streets, and parking areas.

### Premises Liability

From what has been said, it is obvious we are unpersuaded by the argument that liability was barred because Ember was not an invitee and the initial confrontation and subsequent assault occurred outside the boundaries of the Pub's premises. While we ground our reversal of the summary judgment solely on the basis of the failure to take into account the possible assumption of a gratuitous duty to protect persons outside the Pub's premises, other principles

---

**2.** Neither the trial court nor either party raises the question of proximate cause. Only the existence of a legal duty and the breach of that duty were addressed by summary judgment.

of premises liability could support Ember's action for negligence.

The Pub used the abutting sidewalk, and perhaps the adjacent street and parking lots, to contain its waiting customers. It appears to be the common practice of taverns and other public entertainment facilities to similarly allow, indeed promote, the use of adjoining property by patrons overflowing inadequate facilities during holidays and special events. Although we are not aware of any Indiana cases expressly extending an invitor's duty beyond the limits of the business property, several other jurisdictions have been confronted with the proposition and have adopted other approaches to a theory of extraterritorial liability.

### 1. Expansion of the Premises and Invitee Status

An invitor's duty normally extends only to its "premises." However, we recognize that in this case "the premises" may not be limited to the area actually owned or leased by the Pub because its business activities extended beyond its legal boundaries.

A duty of reasonable care may be extended beyond the business premises when it is reasonable for invitees to believe the invitor controls premises adjacent to his own or where the invitor knows his invitees customarily use such adjacent premises in connection with the invitation. *Ollar v. Spakes* (1980), 269 Ark. 488, 601 S.W.2d 868 (adjacent parking lot); *Chapman v. Parking, Inc.*, (1959), Tex.Civ.App., 329 S.W.2d 439 (adjacent parking lot). Here, the record supports a reasonable inference the Pub knew its parking lot was insufficient for its patrons' use; additionally, the Pub was aware its patrons customarily used the parking lot across the street while patronizing it. The initial confrontation occurred at the entrance to this lot, which had similarly overflowed.

Indeed, we are unconvinced either Ember or other patrons of the Pub lost their invitee status while waiting outside the Pub's legal boundaries. In the recent case of *Alholm v. Wilt* (1984), Minn.App., 348 N.W.2d 106, the occurrence of an assault in a public alley behind the tavern did not bar the tavern's liability. The Minnesota Appellate Court found a reasonable inference of foreseeability of the attack due to the aggressive conduct of the patrons involved preceding their departure from the tavern.

Similarly, prospective patrons have been routinely characterized as invitees. *E.g. Ellis v. Trowen Frozen Prods., Inc.* (1968), 264 Cal.App.2d 499, 70 Cal.Rptr. 487 (children approaching ice cream truck were invitees); *Kesner v. Trenton* (1975), 158 W.Va. 997, 216 S.E.2d 880 (minors swimming while father waiting to rent boat at marina). In *Ruehling v. American Legion Pavilion* (1959), 255 Minn. 391, 96 N.W.2d 702, the owner of a dance pavilion customarily allowed ten or fifteen young men to gather outside the entrance and employed one police officer to patrol outside. A prospective patron approaching the pavilion was injured by a member of the group in a scuffle. In applying general premises liability principles, the court noted no member of the group had previously behaved in an unacceptable manner. Since the scuffle was spontaneous, the pavilion's liability was barred due to a lack of foreseeability of injury. Nonetheless, reasonable foreseeability is generally a question of fact for jury determination.

### 2. Dangerous Activity

A landowner or business enterprise does not normally affect risks outside its boundaries; consequently, it is not normally responsible for injuries suffered on abutting property. However, when the activities conducted on the business premises affect the risk of injury off the premises, the landowner may be under a duty to correct the condition or guard against foreseeable injuries. The standard of care for carrying out an activity is no different from that for maintaining property. *Martin v. Shea* (1984), Ind., 463 N.E.2d 1092. The polestar of liability, as in other negligence actions, is the foreseeable risk of harm created by the invitor's activities.

■ Liability is not limited to the area owned or leased, but extends to adjoining areas which harbor a dangerous condition created by the owner's special benefit or use of such areas. *Ellis, supra* (adjoining streets were "premises" for ice cream truck).

This is particularly true when the activity involves use of the adjoining way to the business's commercial advantage. For example, a meat market's manner of operation at one time or another resulted in the vestiges of meat products on the adjoining sidewalks after deliveries. The court found inapplicable those cases which restricted liability to the business premises: "This is not a case of a landowner being responsible for something with which his only connection is the fact of his ownership or use of the [business premises]. We are here concerned with a hazard which resulted from activities carried on in the course of defendant's commercial enterprise." *Kopfinger v. Grand Cent. Pub. Mkt.* (1964), 60 Cal.2d 852, 858, 389 P.2d 529, 533, 37 Cal.Rptr. 65, 69.[3] In a similar fashion, a storeowner was negligent in allowing a condition, which involved a reasonable probability of accident, to continue outside its premises. The store *was aware of the practice* of small boys towing wagons to congregate outside and solicit customers needing assistance in hauling their groceries. The store was liable for injury to a customer knocked down by one of the boys outside. *Horner v. Penn Fruit Co.* (1951), 169 Pa.Super. 473, 82 A.2d 313. If these cases severed liability at the business's front door, a business invitor could invade the public streets for its economic benefit while simultaneously absolving itself from liability otherwise imposed just a few feet away under identical circumstances.

**3. Nuisance**

■ If the owner's activities generate unruly crowds, liability is often based upon nuisance theory. Normally, the public assumes the ordinary risks of ordinary crowds. *Schwartzman v. Lloyd* (D.D.C. 1936), 82 F.2d 822 (negligence in failing to use barricades or crowd control outside store on day of sale). However, if a business establishment is run in a disorderly or offensive manner, an action may lie for the maintenance of a public or private nuisance. For example, in *Commonwealth v. Graver* (1975), 461 Pa. 131, 334 A.2d 667, the Supreme Court of Pennsylvania enjoined the operation of a bar whose unruly patrons were responsible for deteriorating conditions in the area immediately surrounding the bar. Specifically, the patrons engaged in boisterous and violent conduct, urinated and littered on adjacent property, and attacked a resident on one occasion. Although the offensive conduct of the patrons primarily occurred outside the bar, the manner of operation of the bar was nonetheless responsible for the offensive conduct. *Accord Reid v. Brodsky* (1959), 397 Pa. 463, 156 A.2d 334; *Kissel v. Lewis* (1901), 156 Ind. 233, 59 N.E. 478; *see generally* Annot., 5 A.L.R.3d 989 (1966). Although the action in *Graver* was for maintenance of a *public* nuisance, special injury suffered by a specific person or group will support an individual action for damages. *E.g. Reid, supra; Kissel, supra.*

Whatever other theories of liability may exist, it is our conclusion Ember is entitled to a trial on the issue of negligence based upon the reasonable inference that the Pub gratuitously assumed a duty to patrol the area in question and possibly failed to perform its duty in a reasonable manner.

Judgment reversed and remanded.

---

**3.** Similarly, in *Buck v. Acme Mkts.* (1982), 53 Md.App. 151, 456 A.2d 47, liability was barred where the hazardous condition on an adjoining street was created by strangers. A strong dissent, however, emphasized the use of the street by the adjoining business enhanced the likelihood of criminal activity. Although the superseding conduct of a third party would normally bar liability, the business would nonetheless be liable if it created the situation which foreseeably afforded a third party an opportunity to commit the criminal conduct. *See* RESTATEMENT (SECOND) OF TORTS, *supra* §§ 448–49.

SHIELDS, J., concurs.

SULLIVAN, J., dissents with separate opinion.

SULLIVAN, J., dissenting.

I read the majority opinion to hold that a legitimate commercial business may be held liable for being located in a high crime area and to impose liability, virtually absolute, for injuries sustained in the vicinity of the place of business. For this reason, I dissent.

Neither the victim nor the assailants were shown to be guests or patrons. Thus the duty discussed at pages 768–769 of the majority opinion is not involved.

Plaintiff did not by affidavit, or otherwise, proffer evidence sufficient to demonstrate a factual issue on this point. As the trial court stated: "There is no genuine issue of fact that the assailants ... were in any way connected with [the Pub]". (Appellant's Brief, p. 6).

I fail to see any basis for imposing upon defendant the duty to control the actions of strangers. *Pursley v. Ford Motor Company* (1984) 2d Dist.Ind.App., 462 N.E.2d 247; *see also Martin v. Shea* (1984) Ind., 463 N.E.2d 1092.

Whether Ember intended to become a patron at some future moment does not create a duty. He had not yet become a guest or patron and was not even en route to the entrance. He had digressed from any intended entry into the premises and had approached the assailants at the end of the block.

With respect to gratuitous assumption of a duty, I do not consider the three cases cited by the majority, *Perry v. Northern Indiana Public Service Company* (1982) 4th Dist.Ind.App., 433 N.E.2d 44, *Plan-Tec, Inc. v. Wiggins* (1983) 1st Dist.Ind.App., 443 N.E.2d 1212, and *Clyde E. Williams & Associates, Inc. v. Boatman* (1978) 1st Dist., 176 Ind.App. 430, 375 N.E.2d 1138, to be persuasive. All three involve safety requirements for employees or independent contractors on construction sites. The nature and extent of such a duty depends in large measure upon the construction contract involved and upon various safety statutes or regulations. *Harris v. Kettelhut Construction, Inc.* (1984) 2d Dist.Ind.App., 468 N.E.2d 1069.

Representations by the defendant here at an earlier time, to the effect that certain security measures would be taken in order to gain a liquor permit renewal, and additional representations of a similar nature made in order to maintain the good will of the neighborhood, are not guarantees to the public at large or to any specific individual of that person's safety or of freedom from injury occasioned by the criminal attacks of third persons not associated with the defendant or upon his premises.

The retention of an off-duty police officer who may have made an unrelated arrest in the past is not the undertaking of an open-ended and unrestricted duty to indemnify all members of the public against criminal assault by strangers and in all places in the vicinity of, but not on the premises.

I would note in passing, though I do not deem it determinative, that at the time of the attack, the manager of the Pub was himself patrolling the area, even though the additional person hired to patrol had not yet arrived for duty.

In summation, it is my belief that today's decision expands premises liability beyond any reasonable interpretation of existing law or of public policy.

I find this case even less susceptible to a determination of liability than *Welch v. Railroad Crossing, Inc.*, (1986) 2d Dist., Ind.App., 488 N.E.2d 383, in which we affirmed a directed verdict in favor of a tavern. In *Welch*, a patron returning to the tavern was attacked outside the tavern by another patron. We held that there was no duty to anticipate a spontaneous attack. The efforts, here, by the Pub to maintain some degree of order and to maintain the good will of the neighbors does not, in my view, create a duty to anticipate an attack upon a non-patron by a group of non-patrons.

I would affirm the summary judgment.