Robert VERNON, Appellant
(Plaintiff Below),

v.

The KROGER COMPANY, a corporation, LaSalle Square Associates, and Indiana Limited partnership, Lavon R. Blankenbaker, General Partner, Waldemar Hefner Associates, and Indiana Limited Partnership, Thomas L. Hefner, General Partner, Dwain F. Bower and Richard L. Johnson, Limited Partners, B.J. Realty, Inc., Garry B. Lindboe, and Vincent W. Todd, Appellees (Defendants Below).

No. 50A04–9404–CV–153.

Court of Appeals of Indiana.

Aug. 3, 1995.

Gregory Ball, South Bend, Paul Kusbach Attorneys, South Bend, for appellant.

John C. Hamilton, John E. Doran, Doran, Blackmond, Ready, Hamilton & Williams, South Bend, for the Kroger Co.

R. Kent Rowe, Steven D. Groth, Rowe & Rowe, South Bend, for B.J. Realty, Inc., Garry B. Lindboe & Vincent W. Todd.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Robert Vernon appeals the trial court's having granted the respective motions for summary judgment of defendant The Kroger Company and defendants B.J. Realty, Inc., Garry B. Lindboe and Vincent W. Todd. We affirm.

### FACTS

About 6:30 p.m. on December 6, 1987, Robert Vernon ("Vernon") stopped at the La-Salle Square Shopping Center[1] in South Bend in order to purchase several items at the Kroger store ("Kroger"). Vernon parked his automobile in the shopping center parking lot. He walked from his car toward the store. He noticed a large, older car with a driver and two occupants which was parked immediately in front of the Kroger entrance, blocking the handicap ramp leading from the pavement onto the sidewalk. Vernon completed his shopping in about ten minutes and exited the store, observing the same vehicle in the same location.

Vernon walked to his car in the parking lot, started it, and began to drive toward the lane alongside the parked car—into which he would turn left to proceed to his desired exit. As Vernon drove toward the parked car, he observed a man exit Kroger, remove items from his coat, and throw them onto the seat of the parked car. This man entered the car, and Vernon saw all four occupants looking down at the items the man had placed on the seat. Vernon was watching the car and driver, because he had to turn in front of the car. Seeing no indication that the car would move forward in the exit lane, Vernon began turning, moving into the lane. Meanwhile, the driver of the other car stepped on the gas without looking up and ran into the front passenger side of Vernon's car.

Vernon lowered his passenger side window and informed the occupants of the other car that there would be no problem because he had full insurance. He heard someone in the other car say they did not want the police involved; he heard another say they should just leave; and someone said that if they just took off, their license number might be noted. Vernon then saw the man in the passenger seat ease out of the car and move, crouching, around the front of his car. Vernon remembers little of the next sequence of events, except that he was being beaten and ended up on the pavement. The record indicates the beating was committed by two men from the other car.[2] The car then drove away.

---

1. Kroger originally contracted its leasehold with LaSalle Square Associates. In 1980, the Associates sold their interest in the real estate and related leases to co-defendants B.J. Realty, Inc., Gary B. Lindboe and Vincent W. Todd.

2. One of the memoranda filed with the court by Vernon purports to include "attach[ed] certified

On December 5, 1989, Vernon filed his complaint alleging a breach of the "implied warranty of reasonable safety" and breach of the "duty to maintain and operate the shopping center in a reasonably safe condition" against The Kroger Company and the owners of the shopping center—B.J. Realty, Garry B. Lindboe, and Vincent W. Todd (hereafter, "Realty"). (R. filed January 3, 1995,[3] at 16–17). Kroger filed a cross-claim against Realty, citing a clause in the lease between Kroger and the landlord providing that any claim arising from or out of the injury of any person while on a common area shall be the responsibility of the landlord and that the landlord agrees to carry ample insurance to protect the landlord and tenant against such claims. Although the record submitted by Vernon does not contain the defendants' answers to his complaint,[4] a Vernon motion refers to their non-party defenses naming Vernon's assailants Calvin Carter and Kevin Carter as non-parties. Vernon moved for partial summary judgment as to the non-party defenses in September, 1993.

Then, in November, 1993, Kroger and Realty filed motions for summary judgment. Kroger asserted the lack of a genuine issue of material fact as to: 1) whether Kroger owed Vernon a duty of care under the circumstances; and 2) whether any action or inaction on the part of Kroger proximately caused the injuries suffered by Vernon, stating that:

> [w]hile the plaintiff's beating in the vicinity of a Kroger's store forms the centerpiece of the claims plaintiff asserts in this case, Kroger's had nothing whatever to do with either the beating; or the collision of automobiles which preceded it; or the shopping mall parking lot where both the collision and beating took place.

(R. filed June 13, 1994, at 79). According to Realty's motion, the lack of evidence that the landlord was on notice of any criminality in the form of crimes against persons on the parking lot precluded finding that the shopping center landlord had a duty to provide parking lot security. Realty's memorandum in opposition responded to additional arguments propounded by Vernon in his motion for partial summary judgment which asserted his status as a third-party beneficiary to the provision in the shopping center lease. Vernon filed his opposition to defendants' motions. The court held oral argument on the motions, and entered summary judgment for Kroger and Realty on January 10, 1994. The court cited *Welch v. Railroad Crossing, Inc.*, (1986), Ind.App., 488 N.E.2d 383 as "controlling" when it held that "the defendants violated no duty that they owed to the customer Robert Vernon." (R. filed June 13, 1994, at 205).

### DISCUSSION AND DECISION

On appeal from the grant of summary judgment, "we apply the same standard applicable in the trial court." *Malachowski v. Bank One, Indianapolis* (1992), Ind., 590 N.E.2d 559, 562 (citing *Webb v. Jarvis* (1991), Ind., 575 N.E.2d 992). This means that:

> [W]e must consider the pleadings and evidence sanctioned by Ind.Trial Rule 56(C) without deciding its weight or credibility. *Id.* Rational assertions of fact and reasonable inferences therefrom are deemed to be true. *Id.* Any doubt about the existence of a fact or the inference to be drawn from it is to be resolved in favor of the nonmoving party. *Id.* Only if such evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law should summary judgment be affirmed. *Id.*

Vernon's claim against Kroger and Realty sounds in negligence. Therefore, to

---

copies of the criminal convictions" of "the perpetrators" of the assault, named as "the Carter brothers." (R. filed June 13, 1994, at 66). However, such attachment is not included with the record.

**3.** The necessity for so identifying the record to which we refer arises from the fact that the

parties submitted the record for this appeal in six separate segments. Thus, each segment is referred to by the date of its filing.

**4.** The record submitted by Vernon does not contain Vernon's complaint either.

recover Vernon must establish three elements:

(1) a duty on the part of the defendant to conform his conduct to a standard of care arising from his relationship with the plaintiff, (2) failure of the defendant to conform his conduct to the requisite standard of care required by the relationship, and (3) an injury by the plaintiff proximately caused by the breach.

*Webb v. Jarvis,* 575 N.E.2d at 995. The existence of duty, i.e., whether the law recognizes any obligation on the part of a particular defendant to conform his conduct to a certain standard for the benefit of the plaintiff, is a question of law. *Id.* To impose a duty at common law, the court must balance three factors: the relationship between the parties, the reasonable foreseeability of harm to the person injured, and public policy concerns. *Id.* As we stated in the case cited by the trial court, "It is axiomatic that a defendant must have a duty to protect the injured party from harm before the defendant can be held liable." *Welch v. Railroad Crossing, Inc.,* 488 N.E.2d at 387.

■ Vernon argues that both Kroger and the landlord "had reason to know" that shoplifters frequented the Kroger store and "that many shoplifters frequenting this particular store become violent and pose[ ] a general threat to the safety of other patrons." Vernon's Brief at 15. Further, "defendants should foresee that an intercepted shoplifter would engage in a violent criminal act." *Id.* at 16. And defendants had a "duty to provide a reasonably safe place for Vernon to not only shop but for Vernon to exit." *Id.* at 18. Hence, Vernon bases his arguments for imposing a duty on Kroger and its landlord upon the foreseeability of his being beaten.

Vernon suggests the instant circumstances require us to follow *Bearman v. University of Notre Dame* (1983), Ind.App., 453 N.E.2d 1196, and *Ember v. B.F.D.* (1986), Ind.App., 490 N.E.2d 764, rather than *Welch, supra.* In *Bearman,* the plaintiff:

was injured in the parking lot of the Notre Dame football stadium when an intoxicated man unintentionally fell into her from behind, knocking her to the ground, as she was returning to her car after the game.

Following the incident, Bearman sued the University of Notre Dame for damages alleging that she was a business invitee of Notre Dame, and therefore, Notre Dame owed her a duty to protect her from injury caused by the acts of other persons on the premises. At trial, after the close of all evidence, the trial court granted Notre Dame's motion for judgment on the evidence finding that Bearman had failed to show that Notre Dame owed her a duty of reasonable care. On appeal, we reversed and held that Notre Dame did have a duty to take reasonable precautions to protect those who attended the football games from injury caused by the acts of third persons.

*Motz v. Johnson,* (1995), Ind.App., 651 N.E.2d 1163, 1166–67. As we found in *Motz,* the circumstances differ: "Mrs. Bearman was injured when an intoxicated man unintentionally fell into her from behind;" but the assault by Motz "was an act of volition, and the injuries inflicted ... were the intended result of his deliberate design;" and the beating of Vernon was, likewise, "an act of volition, and the injuries inflicted ... were the intended result of" the assailants' "deliberate design." *Id.* at 1167.

■ In *Ember v. B.F.D.* (1986), Ind.App., 490 N.E.2d 764, *modified* (1988) 521 N.E.2d 981, a tavern published and distributed flyers which provided the tavern's telephone number. The flyer suggested calling the tavern "[i]f something in the neighborhood is disturbing you or someone's property" and noted that "we have a police officer after 10:30 and several willing employees prior to that." *Ember,* 490 N.E.2d at 767. Further, the tavern "maintained police and civilian patrols outside its premises." *Id.* Also, officers employed by the bar had provided assistance with problems in the neighborhood occurring off the tavern's premises. We found the tavern's affirmative representations and conduct allowed the inference that the tavern had gratuitously assumed "a duty to patrol the area surrounding its premises and to protect persons (including patrons) within that vicinity from criminal activity." *Id.* at 770. Vernon argues that Kroger may be found to have gratuitously assumed such a

duty here because Kroger had undertaken to control the area of the entrance ramp. Such is shown, Vernon asserts, by the store policy to broadcast over the store intercom a request for a car parked blocking the ramp to be moved. Thus, Vernon posits, Kroger's failure to announce that this particular vehicle was blocking the entrance amounts to their having breached their assumed duty, and—because there was no announcement—an *alleged* shoplifting would proceed, and—because shoplifters do not want to be caught—when the escape vehicle hit Vernon's car, individuals involved in the alleged shoplifting would get out of their car and attack Vernon. This creative argument misses its mark because the evidence shows the announcement is broadcast only within the store, and there is no evidence that the store would broadcast a request to move a vehicle which was manned by the driver.

We believe, as did the trial court, that *Welch, supra,* is controlling. In that case, Ms. Welch was viciously attacked by a knife-wielding fellow patron of the Railroad Crossing tavern in an area behind the tavern. Welch brought an action against the tavern, seeking to recover damages for her injuries and alleging that the tavern had negligently performed its common law duty to protect her from the criminal attack. After Welch's presentation of her case-in-chief, the trial court granted the tavern's motion for judgment on the evidence. On appeal, we affirmed the judgment in favor of the tavern and held that the tavern owed Welch no common law duty to protect her from an unforeseeable, spontaneous attack. We reached that result after noting that while "the proprietor of a tavern owes a duty to exercise reasonable care to protect his patrons (business invitees) from the *foreseeable* disorderly acts of his other patrons," this duty is limited by the proprietor's not being "the insurer of the safety of his patrons" and not being "bound to anticipate the unexpected, independent acts of third persons." *Welch,* 488 N.E.2d at 388 (emphasis in original). Therefore, the:

> duty to anticipate and to take steps to protect against a criminal act arises only when the *facts of a particular case* make it

reasonably foreseeable that a criminal act is likely to occur.

*Id.* at 388 (emphasis in original). Because the assailant's attack was "unforeseeable, unexpected, and spontaneous, ... no common law duty arose to protect Welch" from the attack. *Id.* at 389.

Vernon argues that the foreseeability required by *Welch* is more "abstract" and "generalized," that Kroger and the landlord "should have foreseen in the abstract, in a general way[,] the injurious consequences of their failure to have any security personnel on duty at the time Robert Vernon was attacked and severely beaten." Vernon's Brief at 14. This argument is developed along two themes—that there was no security personnel that evening, and that there is evidence of violent behavior by shoplifters. This Kroger store had a policy of employing off-duty law enforcement officers, who worked armed. However, the testimony is also uncontroverted that the purpose of such security was primarily shoplifter deterrence, with the secondary purpose of apprehension. That a customer who had departed the store should be attacked is not a foreseeable injurious consequence of the absence of a security guard to deter shoplifting. A manager previously assigned to this Kroger had once tried to stop a shoplifter from leaving the store; he broke a bone in his wrist (when he swung and "hit the window frame with [his] fist"), and he "got hit in the eye and had a bloody nose and black eye." (R. filed June 13, 1994, at 318). The manager said he had first notified the security officer, and then asked the shoplifting suspects to stop. He described the incident as one that "probably could have been avoided" had he waited for the alerted security guard, and stated the "only altercations I ever had were something I initiated on my own by going to stop a shoplifter." *Id.* at 326. That the store manager was hurt in the course of trying to stop a shoplifter would not give Kroger reason to know that should an escaping shoplifter's vehicle strike that of a customer, the customer would be beaten.

Vernon further points to statements by various law enforcement officers who had worked at Kroger as security and who de-

scribed experiences with suspected shoplifters who had displayed some physical resistance when the officer attempted to apprehend them. All such officers stated they had worn both badge and gun on their security duty, and would have been thus identifiable to a suspect as an authority for stopping them. Vernon bore no such identification of authority. Vernon casts his plight in having been stricken by the other vehicle as making him like the injured manager, as one who was "'intercepting' them because he refuse[d] to move his car." Vernon's Brief at 38. This purported parallel ignores the fact that his car must not have blocked the other vehicle, as it drove off after the beating. Finally, Vernon points to the volume of police runs, as tabulated by his expert, to the Kroger address and in response to which the landlord "provides zero security personnel for the customers in the common areas" as inviting "criminal predators to fill the vacuum of opportunity." *Id.* at 39. Vernon has mischaracterized the evidence designated to the court. His expert's affidavit refers to police records as showing "911" runs for 7 crimes of violence in 1985, 7 in 1986, and 5 in 1987. The affidavit of a South Bend Police Department officer describes those same records as reflecting "police runs" to the Kroger address. Neither provides evidence that violent crimes had occurred and been verified by the police, only that the police had received a "911" report of a crime and been sent to investigate.

We decline to accept Vernon's offer to find that Kroger should have foreseen, in an abstract and generalized way, the beating of Vernon and, thus, had a duty to protect Vernon therefrom. As to the events of December 6, 1987, Vernon's own statements declare his lack of any feeling that he was in danger as he shopped, as he returned to his car, and as he drove his car to exit the lot. He could not foresee his peril before the onslaught. Likewise, there is no evidence of record which would put Kroger or Realty on notice such a beating might ensue. Vernon

described the assailants, while beating him, as acting "like they were in a blood frenzy. They were just going crazy." (R. filed December 13, 1994, at 36). His description portrays the spontaneity of their actions. Because the attack upon Vernon by occupants of a vehicle which had struck his vehicle was "unforeseeable, unexpected, and spontaneous, ... no common law duty" to protect Vernon from the attack arose on the part of Kroger or Realty. *Welch, supra,* at 389.

We affirm the granting of defendants' summary judgment motions.[5]

RILEY and FRIEDLANDER, JJ., concur.

5. Therefore, we do not reach the other issues discussed by the parties: whether Vernon's motion for partial summary judgment as to nonparty defenses should have been granted; whether Vernon is a third-party beneficiary of the lease clause; and whether certain evidence submitted by Vernon in opposition to summary judgment should have been stricken for failure to comply with discovery.