**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GREGORY KEITH FRYE,
Plaintiff-Appellant,

v.

No. 95-1769

THOMAS L. LUNSFORD, d/b/a Cluck's
Recreation Center,
Defendant-Appellee.

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
Russell A. Eliason, Magistrate Judge.
(CA-94-146)

Argued: February 1, 1996

Decided: October 1, 1996

Before HALL and ERVIN, Circuit Judges, and
BLAKE, United States District Judge for the District of Maryland,
sitting by designation.

_____

Affirmed in part, reversed in part, and remanded for a new trial by
unpublished opinion. Judge Ervin wrote the opinion, in which Judge
Hall and Judge Blake joined.

_____

**COUNSEL**

**ARGUED:** Peter Duane Vieth, WOOTEN & HART, P.C., Roanoke,
Virginia, for Appellant. Frederick K. Sharpless, ELROD, LAWING
& SHARPLESS, P.A., Greensboro, North Carolina, for Appellee.

**ON BRIEF:** John L. Cooley, Jr., WOOTEN & HART, P.C., Roanoke, Virginia, for Appellant. Rachel B. Hall, ELROD, LAWING & SHARPLESS, P.A., Greensboro, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

ERVIN, Circuit Judge:

Gregory Keith Frye was badly injured during a fight in a nightclub parking lot. He sued the club's owner, Thomas L. Lunsford, alleging that Lunsford had failed to provide adequate security and had failed to call for medical attention after Frye was injured. On appeal, Frye contends that he was entitled to a directed verdict on his status as an invitee. We agree, and reverse and remand for a new trial. We affirm, however, the district court's instruction on reasonable care, its dismissal of Frye's insufficient security claim, and its refusal to instruct the jury on Frye's lost earnings.

I.

On September 19, 1992, Frye and his friend Kenny Revis went to Cluck's Recreation Center, a nightclub in the Danville, Virginia, area, just over the North Carolina state line. The club, which features billiard tables and live music on weekend nights, serves no alcoholic beverages except beer.

At trial, the parties disputed where Frye parked his car that night. Frye maintained that he parked in the club's side parking lot--some twenty or thirty yards from the building's side door--went into the club, and never left the property until after he was assaulted. Revis, who rode with Frye, also testified that they parked in the side parking lot. Frye testified that the parking lot had "kind of a grade."

2

Lunsford contended that Frye had parked on a gravel road running adjacent to the parking lot. Apparently, Cluck's customers often parked along that road--especially on weekends--when the club's parking lot was not large enough to accommodate the crowd. Lunsford admitted that he benefitted from the customers who parked on the off-premises road, and that it was "fine with[him]." He also testified, however, that he occasionally announced over the loudspeaker that his patrons could receive a $58.00 ticket for parking there. (Lunsford has since expanded his parking lot.) Lunsford pointed out that before the litigation, Frye stated that he parked his car "up the hill," and described traversing the hill when he went back to his car that evening. Lunsford produced photographs demonstrating that the only hill in the area was off of his property. Thus, Lunsford contended, if Frye went up a hill to get to his car, he must have left the premises.

Shortly before the 2:30 a.m. closing time, Lunsford left the Cluck's building and walked around the parking lot. It was his practice to stroll the grounds before closing to make sure everything was all right. He noticed several cars and a few people standing in the lot and talking, but did not ask any of them to leave. Lunsford went back into the building at about 2:45. Lunsford testified that he customarily did not ask people to leave the parking lot after the club had closed, unless they were "causing a commotion."

While inside the club, Frye had met Corriene Pleasant, another customer. Frye testified that, after closing time, Pleasant asked him for a ride and he reluctantly agreed. Pleasant, in contrast, testified that she reluctantly went to Frye's car after he called to her. In any case, the two wound up in Frye's car together, waiting for Revis. When Revis arrived, he told Frye that he had another ride, and then left. Frye testified that he then began to drive out of the Cluck's parking lot, but never reached the adjacent road leading out to Route 86, the highway in front of the club. According to Frye, as he passed the Cluck's side entrance, Pleasant exclaimed that she saw the person with whom she had originally planned to leave--Thomas Patterson. Frye testified that he pulled up beside Patterson's car to allow Pleasant to go with him, but Patterson apparently was angered to see Pleasant in Frye's car, and began cursing at Frye. Patterson then got out of his car, Frye explained, reached into Frye's car, and grabbed him by the collar. Frye opened the door handle to push Patterson away, and Patterson

3

began beating Frye in the face. Frye did not strike back and was knocked to the ground. Patterson got on top of him, continuing to beat him in the face, until the club's bouncer came and kicked him off of Frye.

The Cluck's bouncer, Hugh Barker, had seen the fight begin. Barker, a friend and stipulated agent of Lunsford, provided unpaid security for the club. Barker had left the building at about 2:45 and encountered some friends, who were sitting in a car in the parking lot. The friends were customers and had been inside that night. Lunsford knew that Barker was outside talking to customers, but did not object. Barker testified that, while standing on the sidewalk next to the club talking, he saw two cars drive onto the parking lot and pull close to where he was. He saw the man he later learned to be Patterson get out of his car to talk to someone in the other car. Barker testified that he then saw Frye get out of his car and stand, holding on to the car, as if intoxicated. Patterson then reached for Frye, and Frye fell to the ground. Patterson straddled Frye and began hitting him. Barker then moved toward the fight, hollering at Patterson to get off and, as he reached them, kicking Patterson off of Frye.

Frye testified that he had drunk only beer that night, and that he was not intoxicated. To the contrary, Pleasant testified that while she and Frye were waiting in his car, they shared a marijuana cigarette and drank from a bottle of "Wild Turkey." Likewise, Patterson testified that he too shared the joint and the Wild Turkey with Frye and Pleasant. Barker testified that only a few minutes passed between the time when the cars drove into the lot and the time that the assault occurred. During that interim, Barker testified, he was close enough to see what transpired in the cars, but did not see any marijuana smoking or alcohol consumption. Lunsford also admitted that he never saw any such conduct. House rules, which were posted over the door, barred illegal drug use and the consumption of alcoholic beverages not purchased at Cluck's.

As a result of the fight, Frye suffered a burst fracture of the C-6 vertebra of the cervical spine and a large gash to the head. He was unable to walk by himself. He claims that he repeatedly asked for help and for an ambulance. He further claims that he heard either Barker or Lunsford tell people in the area to "get that guy out of

4

here." And, "we don't want no trouble." Lunsford testified that, after the fight, he asked those gathered around if they knew Frye, and they answered that he was a friend and that they had been drinking together. Lunsford testified that he said, "well, if he's your friend pick him up, take him to a doctor if he needs it, or take him home." Neither Lunsford nor Barker called for medical help or gave any other assistance.

Someone helped Frye across the parking lot and put him in the back seat of Frye's car. Accompanied by Pleasant, someone then drove Frye's car eight or nine miles to Pleasant's home, where Patterson had also returned. Frye was left to wait for a time in the car. At one point, Pleasant came out and wiped blood from Frye's head, and he asked her to call an ambulance. She told him that she did not have a phone. Eventually, Pleasant's husband drove the car--with Frye still in the back seat--to a convenience store, where emergency help was finally summoned. Frye was taken to Danville Hospital emergency room, where a fractured neck was diagnosed. Frye was then sent to the University of Virginia Medical Center, where he remained for several weeks. After his release, he wore a"halo" and lived with his sister for about four months, until he was able to care for himself.

Frye worked as a transmission rebuilder for Aamco Transmissions in Roanoke, Virginia from his high school graduation, until 1990. Aamco fired and rehired him several times during that period. He was unemployed for a time during 1990 until 1991, when he went to work for Aamco in Danville. He testified that his work as a rebuilder involved some lifting and some small precise work. When Frye returned to work after his recuperation, he was unable to work full-time. He worked one or two days per week at first, increasing to three or four days per week. He testified that he could lift less and was slower at rebuilding transmissions. He testified that he earned $13,946.00 during 1992 before his injury, but he was unable to specify his rate of pay after he returned to work or the number of hours he had worked after the accident compared to the hours he worked before.

Frye, a Virginia resident, sued Lunsford, a North Carolina resident, in the U.S. District Court for the Western District of Virginia. On the motion of Lunsford, the action was transferred to the U.S. District

5

Court for the Middle District of North Carolina. Frye asserted damages resulting from Lunsford's failure to provide adequate security and warnings despite a pattern of violence and Lunsford's failure to aid him to prevent further injury after the assault.

A jury trial took place in December 1994. At the conclusion of Frye's evidence, the magistrate judge granted Lunsford's motion to dismiss the insufficient security claim on the ground that Frye had produced inadequate evidence of foreseeability and of insufficient security measures. The court sent Frye's failure to aid claim to the jury, instructing it to consider as its first issue:"Was the plaintiff an invitee on defendant's property at the time and place of the assault by Patterson?" If the jury found that Frye was not an invitee, the court directed, it was to sign and return the verdict form; for Lunsford owed Frye no duty of care. The jury found that Frye was not an invitee at the time and place of assault, and based on that verdict the court entered judgment for Lunsford.

II.

At the conclusion of the evidence, Frye moved for a directed verdict on his status as an invitee. He argues that the district court erred when it refused to rule, as a matter of law, that he was an invitee at all relevant times. We agree. In North Carolina as under common law, a landowner's standard of care depends upon the plaintiff's status as an invitee, licensee, or trespasser. Newton v. New Hanover County Bd. of Educ., 467 S.E.2d 58, 63 (N.C. 1996). Anyone who enters property for "a purpose directly or indirectly connected with business dealings with the possessor of the land" is a business invitee. Restatement (Second) of Torts § 332 (1965). A business owner has a general duty to exercise reasonable care for the personal safety of invitees on the premises--including protecting patrons from intentional injuries of third persons if the owner has reason to know that such acts are likely to occur. Foster v. Winston-Salem Joint Venture, 281 S.E.2d 36, 38 (N.C. 1981). A parking lot provided for the use of patrons is considered part of the business premises. Id. The mere fact than an injury did not occur during business hours does not necessarily preclude a customer's invitee status. Quinn v. P & Q Supermarket, Inc., 171 S.E.2d 70, 73 (N.C.App. 1969); Brown v. Slack, 65 N.W.2d 382, 385 (Neb. 1954). Nor must an invitee's purpose be to immediately

6

engage in business dealings with the property owner; the benefit to the proprietor "may be indirect and in the future." Restatement (Second) of Torts § 332, cmt. f (1965). Rather, a business visitor is an invitee so long as his or her purpose for entering the premises is reasonably related to the business purpose for which the property is open to the public. Id.

Lunsford contends that Frye lost his invitee status, based on two theories. First, he argues that, because Frye broke house rules by smoking marijuana and drinking Wild Turkey in his car, he became a trespasser. A trespasser is one who goes onto the property of another without any consent or permission of the owner, express or implied. Hoots v. Pryor, 417 S.E.2d 269, 276 (N.C.App. 1992); Restatement (Second) of Torts § 329 (1965).

Accepting as true the testimony that Frye smoked illegal drugs and drank unauthorized alcohol on the premises the night of the assault, that conduct does not, ex post facto, nullify Lunsford's implied invitation to Frye and other Cluck's customers. Lunsford and his agent Barker admitted that, on the night of Frye's injury, they were never aware of any rule violations or illegal activity, and that they never withdrew their consent to Frye's presence on the Cluck's property. Yet Lunsford would have us recognize a definition of trespasser which rests not upon whether an owner consented to the visitor's presence, but upon whether the owner would have consented, had he known what he admittedly did not know. We do not believe that the law of torts requires such a metaphysical inquiry, and we hold that a property owner's duty to a customer is not affected by undiscovered facts which, if known, might have caused him to revoke his permission. Likewise, the fact that the conduct was illegal does not, in itself, destroy a visitor's invitee status. See, e.g., Jones v. Bland, 108 S.E. 344, 345, 346 (N.C. 1921) (describing the general"principle that the fact that plaintiff, at the time he suffered injuries to his person or property from the negligence of defendant, was doing some unlawful act will not prevent a recovery . . ." so long as plaintiff "come[s] [not] as a mere trespasser or wrongdoer, but for some purpose lawful in itself and such as the owner or occupier might reasonably expect to bring him here.") (quotations omitted). Because Frye--like any other Cluck's customer--was implicitly invited onto the premises, and because Lunsford's agent specifically condoned Frye's presence at

7

the time and place of his assault, we find that Frye was not a trespasser as a matter of law.

Under Lunsford's second theory, Frye lost his invitee status by going to his car, which was parked on the off-premises road, and then reentering the parking lot before the assault. Again, we disagree. Although our research has not uncovered North Carolina case law addressing similar facts, many other states have decided that a customer does not automatically lose his or her invitee status by exceeding the property boundaries; rather a business owner's duty may extend beyond the edge of his premises when he knows that his invitees regularly use adjacent property for purposes related to his business. For example, in Ember v. B.F.D., Inc., 490 N.E.2d 764 (Ind.Ct.App. 1986), a bar customer was assaulted in a parking lot located across the street from the bar and often used by its patrons. The court found that the invitor's duty might extend beyond its business property:

> An invitor's duty normally extends only to its "premises." However, we recognize that in this case "the premises" may not be limited to the area actually owned or leased by the Pub because its business activities extended beyond its legal boundaries.

> A duty of reasonable care may be extended beyond the business premises when it is reasonable for invitees to believe that the invitor controls premises adjacent to his own or where the invitor knows his invitees customarily use such adjacent premises in connection with the invitation. Here, the record supports a reasonable inference the Pub knew its parking lot was insufficient for its patrons' use; additionally, the Pub was aware its patrons customarily used the parking lot across the street while patronizing it. . . . Indeed, we are unconvinced either Ember or other patrons of the Pub lost their invitee status while waiting outside the Pub's legal boundaries.

490 N.E.2d at 772 (citations omitted). See also, e.g., Southland Corp. v. Superior Court, 250 Cal. Rptr. 57, 62-63 (Cal.Ct.App. 1988) (where convenience store benefitted from use of adjacent parking lot,

8

and where its business attracted both customers and loiterers, it was "overly simplistic for the issue of control to be resolved solely by reference to a property boundary line"); Holiday Inns, Inc. v. Shelburne, 576 So.2d 322, 329 (Fla.Dist.Ct.App. 1991) (bar had a "duty not only to its patrons who parked on the premises, but also to those who parked on the adjacent lots in accordance with the instructions of the security guards."); Piedalue v. Clinton Elementary School Dist. No. 32, 692 P.2d 20, 23 (Mont. 1984) (duty of business owner to provide invitees with safe ingress and egress includes adjacent areas beyond premises, if he reasonably expects use of adjacent areas by customers in connection with the invitation); Warrington v. Bird, 499 A.2d 1026, 1030 (N.J.App. 1985) ("when a business provides a parking lot across the roadway from its establishment, the duty of the proprietor to exercise reasonable care . . . requires that the patrons not be subjected to an unreasonable risk of harm in traversing the expected route between the two locations.") cert. denied 511 A.2d 653 (N.J. 1986); Chapman v. Parking, Inc., 329 S.W.2d 439, 442 (Tex.Civ.App. 1959) (owner may have duty to warn customers of danger on adjacent parking lot where public might reasonably believe both lots operated as one); Andrick v. Town of Buckhannon, 421 S.E.2d 247, 252 (W.Va. 1992) (restaurant owner who invited customers to park in lot owned by another owed a duty of reasonable care to his invitees).

In the instant case, Cluck's shortage of weekend parking commonly led its customers to use the adjacent road. Lunsford admitted that he was aware of and did not discourage the use of the road for parking, and that he benefitted from the off-premises parking. Because off-premises parking was a common and expected part of egress and ingress from the nightclub, Lunsford's duty of reasonable care to protect his customers may have remained with them while they were on the adjacent road. But we need not go that far in this case; for Frye was indisputably injured on the Cluck's premises. We simply hold that Frye's alleged exit and reentry--whether to drop off a passenger or to reach Route 86--did not destroy his invitee status.

Thus, while much of the dispute at trial concerned whether Frye broke house rules and parked off-premises, we find those facts immaterial to his status. Finding no issue of material fact creating a jury question, we conclude that Frye was an invitee as a matter of law, and

9

was therefore entitled to a directed verdict on that question. We reverse and remand for a new trial.*

III.

On the issue of reasonable care, the district court instructed the jury:

> Now the defendant's duty to take reasonable action to provide assistance or to render care is governed by what is reasonable under the circumstances existing at that time. You must examine the apparent needs of the plaintiff, and whether they were obvious or not, and the opportunities available to defendant to provide care and protection existing at that time and place. This duty will vary according to the circumstances of each case. In some cases, reasonable care may require actually giving medical assistance or to call an ambulance or other assistance, or under some circumstances to turn the person over to friends or people who will provide or obtain care, or to take some other action or lesser action. It is for you to decide what is reasonable under the circumstances of this case.

Frye argues that the district court erred in instructing that under certain circumstances, a defendant could turn an injured person over to "friends," because there was no evidence that Lunsford turned Frye over to "friends." Frye contends that, where uncontroverted testimony indicated that he had never before met Pleasant, Patterson, and others present in the parking lot, the district court's use of the term "friends" to describe the group of persons surrounding him after the assault (including the assailant) improperly diminished Lunsford's responsibility in the eyes of the jury.

_____

*Because we conclude that Frye was an invitee as a matter of law, we need not address his argument that Lunsford offered insufficient evidence that he broke house rules and parked off-premises. Nor do we reach the validity of the district court's instructions to the jury pertaining to Frye's status.

10

We assume the adequacy and sufficiency of a jury charge in the absence of a showing of plain error. Henderson v. Kibbe, 431 U.S. 145, 154-55 (1977), cited in Cooper v. North Carolina, 702 F.2d 481, 483-84 (4th Cir. 1983). We find that the district court's statement did not amount to a factual assertion that the patrons surrounding Frye were indeed his friends. While the term "friends" conceivably may have slightly favored Lunsford, its use was not erroneous or prejudicial within the context of the charge. The court clearly explained to the jury that the defendant's duty would vary in different circumstances, and then provided examples of what conduct might constitute reasonable care. The court never stated that the defendant could have turned Frye over to his friends in this case, but stated that such action could be reasonable under some circumstances. What's more, the instruction was taken from the Restatement (Second) of Torts § 314A, comment f, which was cited by Frye himself in his proposed jury instructions. We find no error.

IV.

Frye also contests the district court's dismissal of his insufficient security claim based on its finding that he had failed to adduce sufficient proof that the assault was foreseeable and that the security measures in place were inadequate. Because we find that Frye unquestionably failed to carry his burden concerning the adequacy of Lunsford's security measures, we need not address Frye's arguments pertaining to his evidence of foreseeability.

To prove inadequate security, Frye testified that he did not see any bouncers in the parking lot that night, and that no bouncer intervened while Patterson was cursing at him. He admitted, however, that he would not have been able to distinguish the bouncers or the owners from the customers. He also admitted that, in fact, a bouncer was standing a short distance from him at the time of the assault, and forced the assailant to stop beating Frye. Frye offered no evidence regarding how many bouncers were on duty that night, how many bouncers are customarily employed at similar establishments, how many bouncers, if any, should have been stationed in the parking lot, and how additional bouncers could have prevented his injury. In sum, Frye offered no evidence to show that Lunsford's negligence in any of these respects was the likely cause of his injury. Accordingly, we

11

affirm the district court's dismissal of Frye's insufficient security claim.

V.

Finally, we consider Frye's contention that his testimony on the amount of his pre-injury earnings in 1992 and his monthly earnings after returning to work in 1993 were sufficient to permit the jury to consider his claim for lost earnings. Frye testified that before his injury on September 19, 1992, he had earned $13,946.00 that year as a transmission rebuilder. He also testified that he was unable to work again until some time in March 1993. After his return, he testified he only was able to work part-time, and found his abilities diminished. In North Carolina, "[b]oth loss of time and loss of earning capacity are recoverable when established by evidence . . . ." Kim v. Hansen, 359 S.E.2d 253, 255 (N.C.App. 1987). However, Frye failed to offer evidence which would allow a jury to compute his lost earnings. He offered no figures revealing his rate of pay before the injury, his number of hours worked in 1992 before the injury, his rate of pay after the injury, his number of hours worked after the injury, or his lost future earning capacity. Such information was surely available to Frye and should have been prepared before trial. But without it, the jury could only have based an award on guesswork. We conclude that the district court's refusal to instruct the jury on Frye's lost wages was not clear error.

VI.

We affirm the lower court's instruction on reasonable care, its dismissal of the insufficient security claim, and its refusal to instruct the jury on lost earnings. But because the district court erred in refusing to direct a verdict on Frye's status as an invitee, we reverse and remand the case for a new trial on the remaining claim.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED FOR A NEW TRIAL

12